1ST SOURCE BANK (f/k/a First National Bank of Mishawaka, Indiana), Appellant (Plaintiff and Third–Party Defendant Below),

v.

Janet A. REA, d/b/a Bottle Shoppe Liquors, James A. Rea and Janet A. Rea, Appellees (Defendants and Third–Party Plaintiffs Below),

and

Eugene C. Muia, Appellee
(Plaintiff Below).

No. 71A03–8911–CV–499.

Court of Appeals of Indiana,
Third District.

Sept. 12, 1990.

James M. Carr, Ben W. Blanton, Baker & Daniels, Indianapolis, for appellant.

Robert D. Lee, Laurie A. Bigsby, South Bend, for appellees.

STATON, Judge.

The First National Bank of Mishawaka ("Bank") filed a complaint against Janet Rea d/b/a Bottle Shoppe Liquors ("Bottle Shoppe") and James Rea as guarantor to collect on a $70,000 note. The Reas counterclaimed, alleging that they had incurred the indebtedness because of false representations made by the Bank. These claims were consolidated with a suit brought by Eugene Muia to recover from the Reas rent due under a lease of the Bottle Shoppe premises. The Reas were awarded $250,000 in punitive damages and $300,000 in compensatory damages (including $97,383.14 to be paid to Muia). The $70,000 note was declared void. 1st Source Bank, the survivor after a merger with First National Bank of Mishawaka, appeals. Several issues are presented for our review, which we restate as follows:

    I.   Did the evidence presented at trial support a finding that the Bank committed fraud or constructive fraud?

II. Did the evidence presented at trial support a finding that the Agreement for Purchase and Sale was void and that the consideration given therefor should be returned?

III. Was the trial court's award of compensatory damages proper?

IV. Was the trial court's award of punitive damages proper?

V. Did the trial court err in failing to dismiss James Rea as a real party in interest?

VI. Was the Bank denied a fair trial due to procedural irregularities?

Affirmed in part; reversed in part; remanded for recalculation of damages.

*Facts*

During August, 1979 Webber sought a $70,000 loan from First National Bank of Mishawaka, with which to buy Sher-lin, Inc. d/b/a Bottle Shoppe Liquors from John Locks. Webber tendered financial statements to the Bank indicating an inventory balance on July 31, 1979 totalling $36,726 and projecting liquor sales of approximately $1,200 to $1,300 per business day. No inventory or independent review of the financial data presented was conducted by the Bank. A $70,000 loan was approved, with the funds to be held in escrow until proof of transfer of Sher-lin, Inc. stock from Locks to Webber was obtained by the Bank. No personal guaranty was obtained from Webber, who signed loan documents as the sole shareholder of Sher-lin, Inc. The funds were disbursed without verification of the anticipated transfer of stock.

No payments were made by Webber to reduce the $70,000 loan balance and his business account was repeatedly overdrawn. Bank personnel conducted an inventory in November, 1979, revealing total merchandise worth less than $10,000. They also monitored sales at Bottle Shoppe Liquors for three days, Friday, Saturday and Monday, November 9, 10 and 12, recording total sales of $1,061.08.

A meeting between Webber's attorney and Bank personnel took place on November 12, 1979. Webber's attorney indicated that his client had committed fraud by intentionally misrepresenting Bottle Shoppe Liquor's sales and inventory in the documents provided to the Bank. Webber admitted the misrepresentation, giving as his reason "greed." (Exhibit K). The Bank demanded possession of its collateral, and closed the store. A Bank Memorandum drafted November 20 estimated that, after comparing the seized assets' value to the $70,000 indebtedness, a $27,000 deficiency existed.

During the same month, James Rea contacted a Bank officer, James Warsaw, to inquire about purchasing the liquor store assets. Rea was informed that the Bank had foreclosed on the subject property. Rea requested financial information, and was given the documents earlier provided to the Bank by Webber. Some disclaimer, the precise wording of which was disputed at trial, accompanied the documents' tender. The results of the November inventory were also given to Rea.

After consultation with his CPA and attorney, Rea verbally offered to purchase Sher-lin, Inc. for $50,000. Warsaw indicated approximately 30 days would be required for review and approval. Rea made a written offer of $60,000 and was again informed that he could expect a response in about 30 days (which would be well into the holiday season, a time of anticipated peak sales). Rea then changed his offer to $70,000, which offer was accepted after a 2–3 day delay.

An agreement was made that Janet Rea would purchase Sher-lin, Inc. from Webber, because James Rea could not hold an additional liquor license. The Bank issued a $70,000 loan to Janet Rea, but retained the proceeds to satisfy Webber's earlier loan. Both Reas personally guaranteed the loan.

The Reas entered into a four year lease with Muia and began to operate the liquor store on December 16, 1979. Upon attempting to place orders to restock the store, Rea discovered there were outstanding bills owed to distributors. The Bank assumed responsibility for such debts. Sales averaged $250–$300 per day in January and February.

The liquor permit under which the Bottle Shoppe was operating expired on February 27, 1980. A March 5 meeting took place before the Alcoholic Beverage Commission ("ABC") for the purpose of transferring the liquor license to Janet Rea. However, John Locks, rather than Webber, appeared at the hearing and the Reas discovered that the license had never been transferred to Webber. Further, a remonstrator appeared at the hearing to assert a claim for an unpaid product bill. The ABC refused to approve the license transfer on that date.

Rea closed the Bottle Shoppe on March 5, but reopened and conducted business for 2 days pursuant to being advised by the Bank of the existence of temporary authority to operate. On the advice of his attorney, Rea refused to operate the business without written authority from the ABC. The Reas permanently closed the store on March 7, 1980.

Rea informed Bank personnel that he was withdrawing his application for transfer of the liquor license ostensibly held by Webber, but actually held by Locks. A later meeting was held before the ABC, and the Bank took possession of the liquor license, which was being held in escrow as of the date of trial.

Other facts will be given as necessary.

### Procedural History

The Bank filed suit against James and Janet Rea on May 28, 1980. The Reas asserted a counterclaim. Muia filed an action against the Reas for breach of their lease, whereupon the Reas filed a Third–Party Complaint for Indemnification against the Bank. The actions were consolidated and tried before the court on July 19 and 20, 1982. On February 10, 1989 the trial court issued its "Findings of Fact, Conclusions Thereon and Judgment."

We present these extensive findings of fact in abbreviated form:

1. The Bank loaned $70,000 to Webber.

2. In extending this loan, the Bank relied, at least in part, on financial statements offered by Webber.

3. Agents of the Bank monitored the business of the Bottle Shoppe Liquore Store on a weekend, with total sales of $1,061.08.

4. The business should have generated gross sales averaging $1,200 per day in order to meet debt service.

5. On November 12, 1979 agents of the bank learned that Webber and Locks intentionally misrepresented the financial statements given to the Bank.

6. Soon after the business was closed by the Bank, James Rea approached the Bank regarding the purchase of the liquor store assets.

7. The Bank tendered to Rea copies of the Webber financial statements knowing them to be false.

8. The agents of the Bank informed Rea they could not represent the accuracy of the information as the statements had not been prepared by the Bank.

9. The Bank did not tell Rea that they knew from monitoring the business what the actual volume of business was, nor did they inform Rea they knew the financial statements were false.

10. The Bank's agents knew the Reas wanted to open in 1979 to take advantage of holiday traffic.

11. Rea offered $50,000 and later $60,000 to purchase the business and was informed the application would take 30 days. Rea was told he could purchase the business immediately for $70,000.

12. The statements regarding time to process the loan were untrue; any application could have been processed in 2 or 3 days.

13. On December 2, 1979 the Bank approved the sale of the assets of Bottle Shoppe Liquor Store to the Reas for $70,000.

14. The bank acted as seller of the Bottle Shoppe.

15. Attorneys on behalf of the Bank prepared an Agreement for the Sale and Purchase of Business between Sher-lin, Inc. by Webber, sole shareholder and Janet Rea.

16. Webber signed the Agreement as president of Sher-lin, Inc.

17. Paragraph 11 of the Agreement provides: "The parties agree that this entire transaction is contingent upon the renewal of the aforementioned package store permit and the approval of the transfer herein contemplated by the Indiana Alcoholic Beverage Commission."

18. Paragraph 12 of the Agreement provides: "The seller further represents that it owns the package store permit and that this permit has never been suspended or revoked."

19. Paragraph 14 of said Agreement provides: "In the event for some reason other than the lack of due diligence, the renewal or the transfer are denied by the Indiana Alcoholic Beverage Commission, this agreement shall become null and void excepting as to the compensation provisions relating to the period of buyers' management."

20. The Agreement further provides: "The earnest money deposit shall be returned to the buyer if any material allegation on the part of seller shall not be met by the seller, or if the Alcoholic Beverage Permit renewal and transfer, the subject hereof, shall not be approved by the Indiana Alcoholic Beverage Commission.

21. James and Janet Rea signed a promissory note for $70,000 to the Bank, which was an assumption by the Reas of Webber's liability to the Bank.

22. As a result of the Agreement to Purchase and Sell Business, the Reas entered into a lease with Muia to lease the premises known as the Bottle Shoppe Liquor Store.

23. The Alcoholic Beverage Permit was scheduled to expire on February 27, 1980.

24. In January of 1980, the Bank discovered Webber was not the sole shareholder of Sher–Lin, Inc. and had no interest in the Alcoholic Beverage Permit.

25. The Bank agents did not inform the Reas of the problem with the permit prior to the hearing for renewal and transfer.

26. On March 5, 1980 James Rea was instructed by the Alcoholic Beverage Commission to close his doors as he was operating illegally.

27. Between December 17, 1979 and March 7, 1980, the average daily gross sales were $200 to $250 per day.

28. The amount of income generated by the Bottle Shoppe Liquor Store was wholly insufficient to meet debt service of the business.

29. The Reas paid in full a $3,000 promissory note to the Bank, but have not paid the $70,000 promissory note.

30. The Reas made only 2 rental payments to Muia.

31. The Alcoholic Beverage Permit of the Bottle Shoppe Liquor Store was not actually renewed or extended until March 31, 1980.

32. Prior to negotiations for the Bottle Shoppe Liquor Store, James Rea had approached the Bank regarding the possibility of building and financing a bowling alley in Mishawaka, Indiana.

33. The Bank advised Rea that business in the bowling alley would be insufficient to satisfy debt service; accordingly, agents of the Bank advised Rea not to pursue the matter.

34. As a result of the Bank's advice, Rea abandoned the idea of building a bowling alley.

35. The Bank admits the existence of a fiduciary duty between the Bank and James Rea, and further admits that this duty included the duty to disclose any facts which might have negative bearing on an application for a loan from the Bank.

36. On March 7, 1980, the date of closing, the value of the liquor license associated with the Bottle Shoppe Liquor Store was $22,500.00.

37. The Reas have not paid the rent due under their lease with Muia.

38. Muia attempted to mitigate his damages by conscientious efforts to re-let the premises.

39. The Reas owe Muia rent from February, 1980 through July, 1982, the date of the trial, in the amount of $27,840.00 plus common area charges of $17,837.52. The Reas additionally owe Muia interest on the unpaid rent and charges at the rate of 10% per annum, amounting to $49,154.26 through January 1989.

40. Muia is entitled to recover $94,831.78 from the Reas.

41. Muia has incurred $2,482.50 in attorney fees and out-of-pocket expenses in connection with enforcing the lease in the amount of $68.86.

42. Muia is entitled to recover $97,383.14 from the Reas.

43. James and Janet Rea are entitled to recover compensatory damages from the Bank including expenses incurred and damages sustained for breach of the lease agreement with Muia and compensatory damages in the sum of $300,000 and punitive damages in the sum of $250,000.

*Record* at 360–368.

Additionally, the court concluded:

1. the Bank, although purporting to act for Webber, was the actual seller of Bottle Shoppe Liquor Store;

2. the terms of the agreement for sale of the subject business were breached in that Webber had no ownership interest in the Bottle Shoppe; the terms were further breached as the alcoholic beverage permit was not renewed and transferred prior to its expiration;

3. the Agreement for Purchase and Sale of Business was therefore void and consideration given therefor should be returned;

4. the Bank by its own admission owed a fiduciary duty to the Reas, including a duty to disclose matters of which the Bank had knowledge which might cast doubt on the legitimacy of the transaction between the parties;

5. the Bank breached the fiduciary duty owed to the Reas by failing to inform James Rea that the financial statements given to him were false and fraudulent, failing to disclose that the Bank's

monitoring showed insufficient sales to service debt, and failing to disclose their knowledge that the alcoholic beverage permit was not owned by Webber;

6. the Bank perpetrated a fraud on the Reas by conveying statements known to be false with the intention that the Reas should rely thereon;

7. James Rea had a right to rely on the Bank's representations and did so to his detriment, as he knew that the Bank had previously relied on the financial statements in extending Webber credit;

8. as a result of said reliance, James Rea purchased assets for $70,000 although they were not worth that amount;

9. as a result of the aforesaid purchase, the Reas entered into a lease with Muia;

10. the Reas suffered damage resulting from the fraud and breach of fiduciary duty by the Bank;

11. any obligations of the Reas to the Bank are null and void;

12. any obligations of the Reas to Muia are the responsibility of the Bank;

13. the Reas are entitled to compensatory damages and punitive damages; and

14. the evidence is clear and convincing and excludes every reasonable hypothesis of innocence on the part of the Bank.

*Record* at 368–372.

Subsequently, the Bank filed a "Motion for Relief from Judgment and to Dismiss Action by James A. Rea" and the Reas filed a "Motion to Amend Pleadings to Conform to Evidence." Oral argument was held before the trial court, but the time for ruling on the motions expired without further activity. The Bank initiated this appeal.

## I.

### Does the evidence presented at trial support a finding of fraud or constructive fraud?

▆ The Bank contends that the trial court's findings of fraud and constructive fraud are wholly unsupported by the record, and vigorously argues that virtually each requisite element remains unproven.

The elements of actual fraud are (1) a material misrepresentation of past or existing fact by the party to be charged which (2) was false, (3) was made with knowledge or in reckless ignorance of the falsity, (4) was relied upon by the complaining party and (5) proximately caused the complaining party injury. *Pugh's IGA v. Super Food Services* (1988), Ind.App., 531 N.E.2d 1194, 1197, *reh. denied.*

The Bank insists that no misrepresentation of fact was made to either Mr. or Mrs. Rea. The Bank argues that the mere conveyance of financial statements does not constitute a representation of fact, particularly as the financial statements tendered to Rea were accompanied by a verbal disclaimer. The Bank claims no knowledge of falsity of those statements, merely the existence of suspicion based on a statement of Webber's attorney. Further, it claims any reliance by Rea was nonexistent or, if it existed, was unreasonable. The Bank claims Rea relied upon his own business expertise and the advice of various persons he consulted, including his attorney and CPA. Thus, it asserts that any damage to him was the result of his own lack of diligence.

On appeal from findings of fact and conclusions of law, we engage in a two-tier level of review. We determine if the evidence supports the findings and if the findings support the judgment. If the findings are not clearly erroneous, the judgment is affirmed. In determining whether the findings and judgment are clearly erroneous, we will neither reweigh the evidence nor judge credibility of witnesses, but will consider the evidence which supports the judgment along with reasonable inferences therefrom. The trial court's findings will be set aside only if the record is devoid of fact supporting the findings. *Craig v. ERA Mark Five Realtors* (1987), Ind.App., 509 N.E.2d 1144.

The trial court concluded that the Bank tendered Webber's financial statements to Rea knowing them to be false, and without disclosing their fraudulent origin or the results of the Bank's independent monitoring of the business. *Record* at 360. The court further concluded that James Rea had a right to rely on the Bank's representations and did so to his detriment. *Record* at 370.

The evidence relevant to the Reas' allegations of fraud included testimony by James Warsaw, formerly a loan officer with the Bank, Mr. Hammes, Bank President, and James Rea.

James Rea contacted Warsaw regarding the liquor store purchase and requested financial data regarding the store's operation. He was given the Bank's inventory results and the documents previously furnished to the Bank by Webber. Some disclaimer accompanied Warsaw's tender of the Webber documents (consisting of a balance sheet, profit and loss statement and statement of projected income). Mr. Hammes indicated that he told Rea there was every reason to doubt the accuracy of the documents. Rea testified that he was told only that the Bank could not be responsible for the documents. He stated that he understood this, but assumed it was because the Bank had not prepared the documents. Questioned by Rea as to the preparer's identity, Warsaw identified the CPA who prepared them as a relative of Webber's. A memorandum prepared by Warsaw states that Rea was told the Bank "would not warrant" the documents. Further, Rea was given limited information regarding the Bank's monitoring of the Bottle Shoppe sales. Rea contends that he was told the traffic was good. Both the Bank and Rea agreed that Rea was not provided with the specific dollar amount of the sales during the 3 day monitoring period.

The Bank contends that the sole evidence presented that the Webber documents were false was hearsay testimony by Warsaw, relating a statement made by Webber's attorney that the documents comprised a classic case of fraud. However, Warsaw testified that he personally confronted Webber, questioning his offer of fraudulent documents. Exhibit K, a Bank Memorandum, reflects the confrontation, wherein Webber admitted the deception and gave as his reason "greed."

Further, Warsaw detailed the efforts made by Bank personnel to ascertain the cash flow and asset value of the Bottle Shoppe. A reasonable inference may be drawn that these efforts imparted actual knowledge to Warsaw that the figures contained in the Webber documents were false.

A Memorandum was drafted by Warsaw, estimating that the value of the Bottle Shoppe assets was approximately $27,000 less than the outstanding Webber loan obtained to purchase those assets. The likelihood of satisfying the deficiency by a lien against personal assets of Webber was slight. No personal guaranty had been obtained from Webber; further, the Bank obtained information that Webber's personal residence was subject to two prior liens.

There were indications that the Bank's security interest in the Bottle Shoppe assets was questionable. Webber had purportedly assigned a security interest to the Bank, signing as President of Sher–Lin, Inc., when he did not in fact own the stock of Sher–Lin, Inc.

In summary, through lack of diligence, the Bank had issued an excessive loan secured by no personal guaranty. The depleted assets of Bottle Shoppe Liquors were subject to a security interest of questionable validity. The Bank had ample evidence, some of it based upon its own investigations, that the data on the Webber statements was incorrect. Further, Bank agents knew that current income from the Bottle Shoppe was insufficient to service a $70,000 debt. Warsaw actively conducted negotiations with Rea for the purchase of the Bottle Shoppe, tendering false financial documents with an ambiguous disclaimer to the effect that the Bank would not "warrant" the documents.

The evidence presented supports the trial court's Findings of Fact and Conclusions of Law. The elements of actual fraud were established, making a review of the evidence in support of constructive fraud unnecessary.

## II.

### *Validity of Agreement for Purchase*

■ Secondly, the Bank contends that the trial court erroneously concluded that the Agreement for Purchase and Sale of Business between Janet Rea and Sher–Lin, Inc. was void and that the consideration given therefor should be returned. Further, the Bank claims that it cannot be held responsible for any breach of the agreement, as Sher–Lin, Inc., rather than the Bank, was the named seller.

The trial court found that the Bank was the actual seller of the Bottle Shoppe as-

sets, although it purported to act for Webber as shareholder of Sher–Lin, Inc. This finding is supported by the record's disclosure that the Bank's agents actively controlled negotiations, drafted the Agreement for Purchase and Sale of Business, and retained the proceeds therefrom.

In its second Conclusion of Law, the trial court found that the Agreement was breached in two respects: Webber did not own the assets of Sher–Lin, Inc. and the liquor permit transfer was not approved by the ABC as contemplated in the Agreement.

An examination of a single contract provision is dispositive. Section 14 of the Agreement provides:

"In the event for some reason other than the lack of due diligence the renewal or the transfer are denied by the Indiana Alcoholic Beverage Commission, this Agreement shall become null and void."

The Bank asserts that this contract provision does not operate because the Reas failed to exercise the requisite due diligence.

The liquor license issued to Sher–Lin, Inc. d/b/a Bottle Shoppe Liquors expired on February 27, 1980. On March 5, 1980, a renewal and transfer was denied by the Indiana Alcoholic Beverage Commission. The record discloses that the ABC refused to transfer the license on March 5 because a discrepancy existed between the named owner in ABC records and the named owner in the Purchase Agreement. Secondly, a creditor of Webber was pursuing his right of protest before the ABC. Clearly, the refusal to transfer was not predicated upon a lack of due diligence by the Reas. The contract, pursuant to its express terms, became void upon the ABC's refusal to transfer.

The Bank seeks to hold the Reas responsible for continuing their efforts to obtain the transfer of the license beyond the ABC's initial refusal to do so. This was not required by the Purchase Agreement.

## III.

### *Award of Compensatory Damages*

▪ Next, the Bank challenges the award of $300,000 in compensatory damages to the Reas. The Bank accurately contends that this award is beyond the scope of the evidence presented at trial. The sole evidence of specific damages consisted of evidence that the Reas had incurred rental expenses, common area charges and interest due pursuant to a lease with Muia for the Bottle Shoppe premises. The findings of fact do not reflect specific damages in addition to the amounts owed to Muia (See Findings of Fact 39–42, Record at 367–68). Further, the findings do not detail how the interest charges were calculated.

The trial court did not provide a calculation of damages amounting to $300,000. Possibly the court intended to award expectation damages to the Reas. However, such a "double recovery" would be impermissible. Having found that the agreement to purchase was null and void, the court could not properly give the Reas the "benefit of their bargain" in addition to releasing them from any obligation thereunder. *Captain & Company v. Stenberg* (1987), Ind.App., 505 N.E.2d 88, 99, *trans. denied.*

## IV.

### *Award of Punitive Damages*

▪ Additionally, the Bank challenges the trial court's award of $250,000 in punitive damages to the Reas. Again, the Bank's challenge is meritorious. The Reas did not initially request punitive damages in their counterclaim. However, during her closing argument, the Reas' counsel requested punitive damages. A conversation then ensued between the attorneys, during which the Reas' counsel expressed her intention to request amendment of the pleadings. The Bank's attorney indicated that he would object.

On April 21, 1989, the Reas filed a "Motion to Amend Pleading to Conform to Evidence". The trial court failed to take action on the motion, and the Reas failed to

pursue the remedy available to them under Ind. Rules of Procedure, Trial Rule 53.1. The award of punitive damages must therefore be reversed.

## V.

### *Dismissal of James Rea as Real Party in Interest*

Subsequent to the entry of judgment in the instant case, the Bank filed its "Motion to Dismiss James Rea as a Real Party in Interest," which motion was deemed denied. The Bank now contends that this motion should have been granted, pursuant to Ind. Rules of Procedure, Trial Rule 17(A) which requires that every action be prosecuted in the name of a real party in interest.

In support of its motion, the Bank presented evidence that, several years after trial, James Rea had commenced a bankruptcy proceeding under Chapter 7 of Title 11, United States Code. The Bank accurately contends that the pending counterclaim became part of the bankruptcy estate upon the filing of Rea's petition.

However, the Bank fails to acknowledge that any assets conveyed to the bankruptcy trustee reverted to Rea upon the denial of his discharge in bankruptcy on January 22, 1986. Failure to order relief results in dismissal of the bankruptcy action. Property of the bankruptcy estate then vests in the entity in whom it was vested immediately prior to commencement of the action. 4 *Collier on Bankruptcy* § 541.04 (15th ed. 1985).

Therefore, Rea was properly retained as a real party in interest.

## VI.

### *Procedural Irregularities*

Lastly, the Bank claims that it was denied a fair trial due to the 6 and ½ year time lapse between trial and entry of judgment, at which time the trial court entered findings essentially adopting the Reas' proposed findings of fact and conclusions of law. The Bank further asserts that the trial court examined an incomplete record prior to entry of judgment.

The Bank failed to show that it was denied a fair trial. The burden is upon the appellant to support claimed errors. *Kranda v. Houser–Norborg Medical Corp.* (1981), Ind.App., 419 N.E.2d 1024, *reh. den.* The Bank's assertion that the record was incomplete at the time it was last examined by the trial court is speculative.

The Bank correctly states the general rule that findings of fact and conclusions of law are not weakened where adopted from the proposed findings of a party. *Indiana Tri–City Plaza Bowl v. Estate of Glueck* (1981), Ind.App., 422 N.E.2d 670, 674, *trans. denied.* The Bank fails to cite precedent for the theory that delay in the adoption of such findings renders them void.

Affirmed in part, reversed in part; and, remanded for a recalculation of damages.

HOFFMAN, P.J., and GARRARD, J., concur.