SJS REFRACTORY CO., LLC, Patrick M. Johnson, and Patrick F. Salwolke, Appellants,

v.

EMPIRE REFRACTORY SALES, INC., Appellee.

No. 02A04–1004–CT–233.

Court of Appeals of Indiana.

June 28, 2011.

Karen T. Moses, Baker & Daniels LLP, Fort Wayne, IN, Attorney for Appellants.

Dane T. Tubergen, Hunt Suedhoff Kalamaros LLP, Fort Wayne, IN, Attorney for Appellee.

## OPINION

BROWN, Judge.

SJS Refractory Co., LLC, ("SJS"), Patrick M. Johnson, ("Johnson"), and Patrick Salwolke ("Salwolke"), (collectively "the Appellants"), appeal the trial court's judg-

ment and award of damages and attorney fees in favor of Empire Refractory Sales, Inc., ("Empire"). The Appellants raise seven issues, which we consolidate and restate as:

I. Whether the trial court erred in entering judgment including damages and attorney fees in favor of Empire on its conversion claim;

II. Whether the trial court erred in awarding damages on Empire's breach of fiduciary duty claim; and

III. Whether the trial court erred in awarding Empire attorney fees as a sanction pursuant to Ind.Code § 34–52–1–1.

We affirm in part, reverse in part, and remand for a calculation of damages consistent with this opinion.

The relevant facts follow. Larry Snell is the owner of Empire, a Fort Wayne, Indiana, refractory services company that has been in business since 1987. Empire produces, sells, installs, and services refractory materials that are used to line high-heat environments such as industrial furnaces and kilns. Bill Sale began working as a sales representative at Empire in 1995. His employment contract included a noncompete agreement wherein Sale agreed not to engage in any business which competed against Empire during the period of the contract and for a period of two years after the termination of the contract within a 150–mile radius of Fort Wayne.

In 1998, Snell transferred a ten percent interest in Empire to Sale, who became a company vice-president. At the same time, Snell also transferred to Sale minority ownership interests in two other refractory service companies in Chicago and West Virginia. In 2004, following the death of his son, Snell began to reduce his full-time involvement with Empire and turned over management of the company to Sale.

Sale eventually began to negotiate the purchase of Empire from Snell. Throughout the negotiations, Sale was responsible for the day-to-day operations of Empire, including hiring and firing employees. In July 2004, Sale promoted Johnson, Sale's friend and Empire's Construction Manager, to the position of full-time sales representative. Although Snell told Sale to have Johnson, and all full-time sales representatives, sign a noncompete agreement, Sale failed to do so. In 2005, Sale hired Salwolke, his best friend and next door neighbor, as an Empire sales representative. Sale did not ask Salwolke to sign a noncompete agreement either.

In the summer of 2005, Sale invited Snell to his home to discuss his purchase of Empire and the Chicago and West Virginia companies. During the discussion, Sale insisted that Snell accept less than the previously-negotiated price for Empire. When Snell refused, Sale told Snell that he had promoted Johnson and hired Salwolke without requiring either of them to sign a noncompete agreement. Sale told Snell that without these agreements, Johnson and Salwolke could start up a company to compete with Empire, and Sale could find other employment and join them two years later after the expiration of his noncompete agreement. Despite this conversation, Sale continued to negotiate with Snell for the purchase of the companies.

In late 2005, after Sale and Snell had come to a preliminary agreement, Sale discovered that Snell had added significant mortgage debt to Empire's books. As a result, Sale determined that Empire would not produce sufficient cash flow to pay all of the new debt and requested that Snell reconsider the sale price. When Snell re-

fused, Sale determined that purchasing Empire was not economically feasible. Sale told Snell that if he was unable to purchase Empire and left its employ, other Empire employees would also leave. Snell responded that, "Pat Johnson [would] never go anywhere." Transcript at 1182.

However, as early as December 2005 or January 2006, Johnson was using Empire's facility and tools to build hot gunning nozzles for SJS, which was in the planning stages. Further, during the week of January 22, 2006, Salwolke contacted Lake City Bank about a line of credit for SJS. On February 1, 2006, Salwolke used his Empire e-mail account to look for space to lease for SJS, and on February 23, 2006, the Articles and Certificate of Organization for SJS became effective. At the beginning of March 2006, Salwolke and Johnson offered jobs at SJS to six of Empire's employees, all of whom accepted.

In addition to hiring Empire's employees, Johnson and Salwolke began recruiting Empire's customers. For example, in late February 2006, Johnson met with Patrick Cloyd from SPX Contech. SPX had been an Empire customer for twelve to fourteen years. Johnson asked Cloyd if he could do work for SPX if he started his own company. On SJS's first day of business, the new company received a $134,000 quote for a job from SPX, and SJS performed the job in early April 2006. Johnson also met with Paul Weirbowski and Dave Bednarz from IDI at the end of February 2006 at the Oyster Bar to discuss SJS doing work for IDI. IDI had been an Empire customer for five or six years. Lunches and dinners charged to Johnson's Empire expense account in February and March 2006 are consistent with dates Johnson dined with Empire's customers and attempted to solicit their business. For example, a $300.00 receipt for the Oyster Bar Bistro on February 20, 2006, is consistent with the place and date Johnson met with Weirbowski and Bednarz.

During the week of March 13, 2006, Tim Frost, a supervisor at Baker–Schindler, called Johnson at Empire to inquire about a bid for work in a furnace pit. Johnson told Frost he was leaving Empire and that he could complete the job for him the following week through SJS. Johnson called Frost on March 18, 2006, and secured the job for SJS before he left Empire.

Salwolke was also soliciting business from Empire's customers during this time. For example, one day Salwolke and Sale visited Dalton Foundaries, Wabash Alloys, Exide, and G & S Metals representing Empire, but soliciting business for SJS. SJS received work from all four businesses shortly after it opened. Dalton had been an Empire customer for over twenty-five years. Johnson and Salwolke personally contacted at least thirteen of Empire's long-time customers during late February and March 2006.

In addition to Johnson and Salwolke's face-to-face solicitations of Empire's customers, on March 16, 2006, Johnson used an Empire credit card to pay $545.66 for the renewal of plates on a truck and trailer to be used by SJS. The following day, Johnson took Empire employee Norm Edwards with him to Cleveland, Ohio, to drive back a delivery truck full of equipment and materials for SJS. Both men were paid wages by Empire for the day they spent in Cleveland on SJS business. Edwards was specifically paid $124. Salwolke also prepared marketing materials while employed by Empire. On March 18, 2006, Salwolke sent a letter to Empire customers announcing the formation of SJS on SJS letterhead and offering to buy these customers a cup of coffee and discuss their refractory needs.

On March 18, 2006, Johnson went to Empire and removed customer forms, tools, equipment, and works-in-progress, all of which he took to SJS. The items Johnson took were related to Empire customers he hoped to serve at SJS. Johnson did not have the authorization to take these items. On March 20, 2006, Johnson resigned from Empire. That same week, beginning on March 22, 2006, Johnson returned multiple truckloads of the items he had just taken from Empire. For example, furnaces belonging to Empire's customer SPX were returned along with lids and lifting arms. SJS continued to return items to Empire during the course of the following week. The value of the equipment and forms returned was $79,313.00. Empire compared inventory before and after March 17, and identified missing products. The value of the equipment and inventory that was not returned by SJS was $53,275.28, and the value of the tools that were not returned was $18,899.00.

On April 26, 2007, Empire filed a complaint against SJS, Johnson, Salwolke, and Sale. The complaint alleged that (1) Salwolke, Johnson, and Sale breached their fiduciary duty to Empire; (2) Sale committed constructive fraud and breached his employment contract; and that (3) Salwolke, Johnson, and SJS were both unjustly enriched and committed tortious interference with a contract, tortious interference with a business and contractual relationship, and conversion and theft. In addition, Empire asked the court to award it damages and attorney fees pursuant to Ind.Code § 34–24–3–1, the Indiana Crime Victims Relief Act. Lastly, Empire asked the trial court to issue an order for its immediate possession of its property wrongfully detained by Salwolke, Johnson, and SJS.

On October 14, 2009, over one year after a nine-day bench trial in the fall of 2008, the trial court entered a 48–page judgment, which provides in relevant part as follows:

In accordance with the Indiana statute, Empire is entitled to the following damages, jointly and severally, from Johnson, Salwolke and SJS for the conversion of its inventory, tools, equipment, and materials:

| | |
|---|---|
| Statutory damages for equipment and forms returned March 22, 23, 24, 27, and 28, 2006 (total value: $79,313.00(x2)) | $158,626.00 [1] |
| Statutory damages for lost product/inventory (not returned) (total value $53,275.28 (x3)) | $159,825.84 |
| Statutory damages for lost tools (not returned) (total value: $18,899.00(x3)) | $ 56,697.00 |
| TOTAL | $375,148.84 |

Empire's attorneys' fees re: conversion TBD

(Amount to be determined pursuant to the November 6, 2008 Order approving the Stipulation granting this Court the right to rule on post-judgment matters raised by the filing of any motions by the parties within thirty (30) days of the Court's entry of judgment and the Court hearing evidence on Empire's attorney fees and costs)

Court costs (approx.) TBD

(Amount to be determined pursuant to the November 6, 2008 Order approving the Stipulation granting this Court the right to rule on post-judgment matters raised by the filing of any motions by the parties within thirty (30) days of the Court's entry of judgment and the Court

---

1. Because these items were returned, albeit after being stolen, it is fair to only double, rather than triple, the value for the purposes of statutory damages. (Footnote in the trial court's judgment).

hearing evidence on Empire's attorney fees and costs)

Total damages arising out of conversion TBD

\* \* \* \* \* \*

Based on the foregoing Findings of Fact and Conclusions of Law, it is therefore ordered, adjudged, and decreed that:

Judgment is ORDERED and ENTERED in favor of Empire and against Defendant Patrick F. Salwolke on Empire's claim for breach of fiduciary duty. Empire is entitled to the following relief:

a.) $20,458.13 for the salary and benefits Salwolke received from Empire from January [13, 2006] through March 2006;[2]

b.) $12,600.00 for expenses Empire incurred for loss of its materials;

c.) $124.00 for the wages Empire paid to Norman Edwards when he was picking up equipment for SJS;

d.) $235,994.62 in punitive damages jointly and severally with Johnson and SJS.

Judgment is ORDERED and ENTERED in favor of Empire and against Defendant Patrick M. Johnson on Empire's claim for breach of fiduciary duty. Empire is entitled to the following relief:

a.) $40,015.62 for the salary and benefits Johnson received from Empire from January [1, 2006] through March 2006;[3]

b.) $12,600.00 for the expenses Empire incurred for loss of its materials;

c.) $124.00 for the wages Empire paid to Norman Edwards when he was picking up equipment for SJS;

d.) $235,994.62 in punitive damages jointly and severally with Salwolke and SJS.

Judgment is ORDERED and ENTERED in favor of Empire and against William G. Sale on Empire's claims for breach of fiduciary duty and breach of employment agreement. Empire is entitled to the following relief:

a.) $27,361.76 for the salary and benefits Sale received from Empire;

b.) $235,994.52 in punitive damages.

Judgment is ORDERED and ENTERED in favor of Empire and jointly and severally against Johnson, SJS, and Salwolke on Empire's conversion claim in an amount to be determined pursuant to the November 6, 2008 Order approving the Stipulation granting this Court the right to rule on post-judgment matters raised by the filing of any motions by the Plaintiff filed within thirty (30) days of the Court's entry of judgment and the Court ruling on Empire's attorney fees and costs.

Judgment is ORDERED and ENTERED for all Defendants on Empire's claim for unjust enrichment and constructive trust.

Judgment is ORDERED and ENTERED for SJS, Salwolke and Johnson on Empire's claim for wrongful inducement of Sale's breach of his employment agreement.

Judgment is ORDERED and ENTERED for SJS, Salwolke, Johnson and Sale on Empire's claim for wrongful interference with business relationships.

Appellants' Appendix at 97, 104.

On November 11, 2009, Empire filed a "Petition for Attorney[ ] Fees in Connec-

---

**2.** This sum includes benefits such as vacation, bonus, health and life insurance, 401(k), cell phone, and company-provided vehicle. (This Court's footnote).

**3.** This sum also includes benefits such as vacation, bonus, health and life insurance, 401(k), cell phone, and company-provided vehicle. (This Court's footnote).

tion with Judgment on Conversion Claims," wherein it asked the court to award it $126,282.20 in attorney fees allocated to its judgment for conversion pursuant to Ind.Code § 34–24–3–1. The following day, Empire filed a thirty-six-page Motion for Sanctions seeking $634,949.05 in attorney fees and expenses as sanctions pursuant to Ind.Code § 34–52–1–1 for Defendants' deceptive discovery responses and trial testimony.

On March 22, 2010, the trial court granted Empire's petition for attorney fees and ordered Johnson, Salwolke, and SJS, jointly and severally, to pay $77,725.00 in attorney fees. In addition, the court granted Empire's motion for sanctions, and ordered Johnson, Salwolke, and SJS, jointly and severally, to pay Empire's attorneys $100,000.00 as sanctions. The court also ordered Sale to pay Empire's attorneys $50,000.00 as sanctions. Lastly, the court reduced the punitive damages it ordered Sale to pay from $235,994.52 to $82,085.28.

Johnson, Salwolke, and SJS now appeal the trial court's judgment and award of damages, sanctions, and attorney fees. Sale is not a party to this appeal. Our discussion of the issues includes additional facts.

### I. Conversion Judgment, Damages and Attorney Fees

The first issue is whether the trial court erred in entering judgment in favor of Empire on its conversion claim. A civil action under the criminal conversion statute is permitted by Ind.Code § 34–24–3–1, which provides that "[i]f a person suffers a pecuniary loss as a result of a violation of IC 35–43 … the person may bring a civil action against the person who caused the loss for [damages]." Ind. Code § 35–43–4–3 provides that a "person who knowingly or intentionally exerts unauthorized control over the property of another person commits criminal conver-

sion. . . ." The plaintiff in a civil conversion action is required to prove these elements by a preponderance of the evidence. *McLemore v. McLemore*, 827 N.E.2d 1135, 1144 (Ind.Ct.App.2005). In order to establish a claim, a plaintiff must show a violation of one of the specific code sections and that such violation caused the loss suffered by the plaintiff. *Id.*

With respect to a conversion claim, damages are restricted to actual losses sustained as a proximate result of the conversion and damages are mitigated by returning the property to the owner. *Nance v. Miami Sand & Gravel, LLC*, 825 N.E.2d 826, 836 (Ind.Ct.App.2005), *trans. denied.* Where converted property is returned, damages for the deprivation of the use of the property may be measured by the fair rental value for the period of conversion. *Id.*

Here, the Appellants argue the trial court erred in entering judgment in favor of Empire on its property conversion claim because Empire failed to prove it suffered a pecuniary loss on the property items that were subsequently returned. The gist of their argument is that one cannot suffer a pecuniary loss when items are subsequently returned.

Even if Empire suffered a pecuniary loss, the trial court improperly calculated the damages on the converted property that was subsequently returned. The value of the converted property was $79,313.00. The trial court doubled the value of the property for the purpose of statutory damages, and awarded Empire $158,626.00. The value of the converted property is not a proper measure of damages for property that is returned. Rather, the proper measure of damages is the fair rental value of the property for the period of conversion. *See id.* Because Empire failed to present evidence of the

fair rental value of the property for the period of conversion, there is no evidence to support an award of damages for the converted property that was returned. The trial court therefore erred in awarding Empire $158,626.00 in damages for this property, and we reverse this portion of the judgment.

The Appellants next challenge the $53,275.28 award of damages for the converted property that was not returned. This damages award was subsequently tripled to $159,825.84 for the purpose of statutory damages. According to the Appellants, this award of damages was erroneous because Exhibit 54, which includes the estimated purchase price of each of the converted items and supports the award, was hearsay and should not have been admitted at trial.

■■■ However, property owner Snell prepared the exhibit. The law is well settled that the owner of a good is competent to testify as to its value. *Court View Centre, LLC v. Witt*, 753 N.E.2d 75, 82 (Ind.Ct.App.2001). Further, the purchase price of a good is admissible as evidence of the value of that good. *Carpetland U.S.A. v. Payne*, 536 N.E.2d 306, 311 (Ind.Ct.App. 1989). We therefore find no error and affirm this award of damages for the converted property that was not returned.

■■ The Appellants also challenge the $18,899.00 award of damages for converted tools that were not returned. This damages award was also tripled to $56,697.00 for the purpose of statutory damages. According to the Appellants, this award of damages is erroneous because Exhibit 60, which supports the award, was also erroneously admitted into evidence at trial. However, the Appellants have waived ap-

pellate review of this issue because they failed to object to the admission of this Exhibit at trial.[4] *See Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind.2008) (stating that a party must object to the evidence at trial to preserve the error). We find no error and also affirm this award of damages for the converted tools that were not returned.

■■■ The Appellants further contend that the trial court erred in awarding Empire $77,725.00 in attorney fees in its conversion judgment. Ind.Code § 34–24–3–1 provides for an award of attorney fees if the plaintiff proves pecuniary loss as the result of conversion. *Nance*, 825 N.E.2d at 838. An award of attorney fees is appropriately limited to those fees incurred because of the basis underlying the award. *Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 661 (Ind.Ct.App.2008). The party requesting an assessment of attorney fees bears the burden of proving an appropriate allocation of fees between the issues for which fees may be assessed and those for which they may not. *Id.* While a perfect breakdown is neither realistic nor expected, a reasonable, good faith effort is anticipated. *Id.* We review the award of attorney fees under the Crime Victim Relief Act for an abuse of discretion. *Ruse v. Bleeke*, 914 N.E.2d 1, 9 (Ind.Ct.App.2009).

■■ Here, Empire's counsel submitted an attorney fee affidavit, which revealed that counsel has twenty-two years of experience in complex civil and commercial litigation. He has represented corporations, closely-held businesses, and individuals in a wide-range of commercial litigation matters. Because Empire's award of attorney fees was limited to those fees related to its conversion claim, counsel thoroughly re-

---

4. The Appellants' initial objection to the Exhibit was withdrawn, and at the time the Exhibit was admitted into evidence, Appel-
lants' counsel stated that she had "no objection" to Exhibit 60. Transcript at 209.

viewed all of the time he spent representing Empire in order to make a proper and reasonable allocation of fees. Counsel explained that he divided the time records into the following six categories: (1) Case Management/Discovery, (2) Summary Judgment, (3) Mediation, (4) Pre–Trial, (5) Trial, and (6) Post–Trial. Counsel then excluded entries that dealt solely with issues other than the conversion claim, and reviewed the remaining time entries within the six categories. Counsel reviewed the remaining entries taking into account his knowledge of the legal services performed, relevant legal issues, and litigation strategy. He then assigned percentages to each of the categories to reflect the proper allocation. Counsel explained that his percentages were very conservative in favor of the defendants, and that his reasonable, good faith allocation of legal fees performed by him for the conversion claim was $118,427.20. Counsel further explained that from an overall perspective, this was approximately nineteen percent of all legal fees he charged to Empire in this case.

After reviewing the evidence, the trial court awarded Empire $77,725.00 in attorney fees. Based upon the facts and circumstances of this case, the trial court did not abuse its discretion in its award of attorney fees for conversion.

## II. Breach of Fiduciary Duty

 The second issue is whether the trial court erred in calculating damages on the breach of fiduciary duty claim. An employee owes his employer a fiduciary duty of loyalty. *Kopka, Landau & Pinkus v. Hansen,* 874 N.E.2d 1065, 1070 (Ind.Ct.App.2007). To that end, an employee who plans to leave his current job and go into competition with his current employer must walk a fine line. *Id.* Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer. *Id.* An employee may make arrangements to compete with his employer, such as investments or the purchase of a rival corporation or equipment. *Id.* However, the employee cannot properly use confidential information specific to his employer's business before the employee leaves his employ. *Id.* These rules balance the concern for the integrity of the employment relationship against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty. *Id.* at 1070–1071.

 The comments to the Restatement (Third) of Agency similarly recognize that:

> In retrospect it may prove difficult to assess the propriety of a former agent's conduct because many actions may be proper or improper, depending on the intention with which the agent acted and the surrounding circumstances. For that reason it may be difficult to draw a clean distinction between actions prior to termination of an agency relationship that constitute mere preparation for competition, which do not contravene an employee's or other agent's duty to the principal, and actions that constitute competition.

Restatement (Third) of Agency § 8.04 cmt. c (2006). Thus, although an employee may not actively and directly compete with his current employer, he may prepare to do so without breaching his fiduciary duty of loyalty. *Kopka,* 874 N.E.2d at 1071. The remedy for the breach of a fiduciary duty is requiring the agent to disgorge all compensation received during the period of employment in which the agent was also breaching his fiduciary duty. *Wenzel v.*

*Hopper & Galliher, P.C.,* 830 N.E.2d 996, 1001 (Ind.Ct.App.2005).

■■■■■ Further, Indiana recognizes a cause of action for damages resulting from conspiracy. *Huntington Mortgage Company v. DeBrota,* 703 N.E.2d 160, 168 (Ind.Ct.App.1998). Civil conspiracy is defined as a "combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." *Id.* Each participant in the conspiracy may be held responsible as a joint tortfeasor for damages caused by the wrongful or contemptuous acts regardless of the degree of active participation. *Boyle v. Anderson Fire Fighters Association,* 497 N.E.2d 1073, 1079 (Ind.Ct.App. 1986), *trans. denied.*

Here, the trial court concluded that Johnson began breaching his fiduciary duty on January 1, 2006, and that Salwolke began breaching his fiduciary duty on January 13, 2006. The court explained that Johnson and Salwolke were each liable for all amounts paid to them by Empire from January 2006 through March 2006, when they were conspiring to compete and/or in fact competing with Empire. The court therefore ordered the disgorgement of their salaries and benefits beginning on those dates.

■■■■ Our review of the evidence reveals that as early as December 2005 or January 2006, Johnson was using Empire's facility and tools to build hot gunning nozzles for SJS. Because Johnson's actions were done in furtherance of the conspiracy against Empire, Salwolke can be held responsible as a joint tortfeasor for damages regardless of his degree of participation. *See id.* This evidence supports the trial court's conclusion that Johnson and Salwolke began breaching their duties to Empire as early as January 1, 2006. The order of

disgorgement is therefore proper, and we find no error.

■■■ Johnson and Salwolke also argue that the trial court erred in ordering them to pay Empire $12,600.00 for expenses Empire incurred for the loss of materials that it ordered for its customer Dalton Foundry. SJS ordered these same materials on March 7, 2006. The trial court concluded that because SJS ordered the same materials that Empire had in stock for Dalton and failed to sell, the Appellants had to pay Empire $12,600.00 for these materials. However the evidence does not support this award of damages. There is no evidence that the materials SJS ordered on March 7 were purchased for Dalton and thereby replaced the materials that Empire purchased for Dalton. We further note that this award of damages is contrary to the trial court's specific findings that "Empire identified no sales or construction work that was lost by it as a result of communication by the SJS defendants prior to March 20, 2006," and that "[t]here was no evidence presented of any specific work or material sale that would have been awarded to Empire if SJS had not bid on the project." Appellants' Appendix at 88, 89. Based upon the foregoing, the trial court erred in awarding Empire the $12,600.00 in damages.

■■■ Johnson and Salwolke also argue the trial court erred in ordering them to pay Empire $124.00 in damages for the wages Empire paid to Norman Edwards on March 17, 2006, when he accompanied Johnson to Cleveland to pick up materials for SJS. Soliciting an Empire employee to spend the day providing services to SJS constituted another breach of fiduciary duty. There was clearly evidence presented that supported a basis upon which to require SJS to reimburse Empire for that cost as Edwards was employed by Empire to work for Empire, and not SJS, on the

day in question, and his actions benefitted SJS, not Empire. The trial court did not err in ordering the Johnson and Salwolke to pay $124.00 in damages for Edwards' wages.

Lastly, the Appellants argue that the trial court erred in awarding Empire punitive damages on the breach of fiduciary duty claim where Empire did not request punitive damages on this claim and stated during trial that the only punitive damages claim it was seeking was for tortious interference with a contract. Specifically, at trial, Empire's counsel told the court that, "Just to make it clear, the punitive damages claim is the assertion that Mr. Johnson, Mr. Salwolke and SJS tortiously interfered with the contract of Bill Sale." Transcript at 1569. The trial court entered judgment in favor of the Appellants "on Empire's claims for wrongful interference with business relationships." Appellants' Appendix at 97.

We addressed a similar issue in *1st Source Bank v. Rea*, 559 N.E.2d 381 (Ind. Ct.App.1990), *trans. denied*, where the bank challenged the trial court's award of punitive damages. We reversed, noting that the plaintiffs had not requested punitive damages in their counterclaim and that the trial court had not granted a motion to amend the pleadings to conform to the evidence. *Id.* at 388–89. *See also* Ind. Trial Rule 15(B) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

■■■ Similarly, here, the complaint did not contain a request for punitive damages on the breach of fiduciary duty claim, and no request for punitive damages was made at trial on this claim. Rather, Empire's counsel specifically stated that the request for punitive damages was on the tortious interference with a contract claim, and

judgment was entered in Appellants' favor on this claim. Further, the trial court did not grant a motion to amend the pleadings to conform to the evidence, and given that Empire's counsel made clear that the punitive damages claim was "the assertion that Mr. Johnson, Mr. Salwolke and SJS tortiously interfered with the contract of Bill Sale," we cannot find that this issue was raised by consent of the parties per Indiana Trial Rule 15(B). Transcript at 1569. Here, as in *1st Source Bank*, the trial court erred in awarding punitive damages on the breach of fiduciary duty claim. We therefore reverse the award of punitive damages.

### III. Attorney Fees Pursuant to Indiana Code § 34–52–1–1

The third issue is whether the trial court erred in ordering Johnson, Salwolke, and SJS, jointly and severally, to pay Empire's attorneys $100,000.00 as sanctions pursuant to Ind.Code § 34–52–1–1. Empire filed a thirty-six page motion for sanctions posttrial in which it alleged that the Appellants had litigated the action in bad faith.

■■■ A court may award attorney fees to the prevailing party if the court finds that a party litigated the action in bad faith. Ind.Code § 34–52–1–1(b)(3). Pursuant to this statute, bad faith is demonstrated where the "party presenting the claim is affirmatively operating with furtive design or ill will." *Fisher v. Estate of Haley*, 695 N.E.2d 1022, 1029 (Ind.Ct.App. 1998). An award under this statute is afforded a multistep review. *Knowledge A–Z, Inc. v. Sentry Insurance*, 891 N.E.2d 581, 585 (Ind.Ct.App.2008), *trans. denied.* First, we review the trial court's findings of fact under a clearly erroneous standard, and then we review the trial court's legal conclusions de novo. *Id.* Finally, we review the trial court's decision to award attorney fees and the amount thereof un-

der an abuse of discretion standard. *Id.* at 585–586.

 Here, the Appellants argue that the trial court erroneously based its award of sanctions on an allegedly false answer to Interrogatory 9. However, our review of the trial court's order reveals that the court did not base its award on one interrogatory answer. Rather, the trial court concluded that the "Defendants' litigation strategy was to lie and cover up their conduct, and the record and the findings in this case are replete with examples of this litigation strategy. Offering false testimony most certainly is a clear example of bad faith litigation." Appellants' Appendix at 107. Further, as Empire points out, the trial court's findings of fact from the bench trial contain thirty-six findings "detailing at least 24 distinct lies, misstatements and deceitful attempts to avoid admitting the truth." Appellee's Brief at 33. Each of the court's detailed findings is further supported by reference to the 1,703–page transcript and exhibits. Clearly the trial court based its award of sanctions on more than the single fact that Johnson and Salwolke were allegedly dishonest when answering Interrogatory 9.

 Because the trial court's findings state that it found the Appellants demonstrated multiple examples of bad faith litigation, we conclude that the trial court was within its discretion in ordering Johnson, Salwolke, and SJS, jointly and severally, to pay Empire's attorneys $100,000.00.[5]

For the foregoing reasons, we affirm in part, reverse in part, and remand for a calculation of damages consistent with this opinion.

Affirmed in part, reversed in part, and remanded for a calculation of damages consistent with this opinion.

ROBB, C.J., and RILEY, J., concur.

---

5. We further note that there is no requirement that the party seeking the award of attorney fees pursuant to Ind.Code § 34–52–1–1 make an allocation between those fees generated because of the conduct giving rise to the fee claim and those fees which do not. *See Prime Mortgage,* 885 N.E.2d at 663 (stating that trial court was within its discretion to award all incurred attorney fees not merely those accrued as a result of defendant's failure to obey discovery orders, defendant's claims for unpaid wages, and defendant's violation of the Crime Victims Statute). Lastly, the Appellants have cited no authority in support of their assertion that an elevated standard of proof is required under this statute. Rather, they concede that "Indiana has not specifically adopted the clear and convincing standard of proof under I.C. 34–52–1–1...." Appellants' Brief at 39. We decline to impose such a standard.