*Mylan Technologies, Inc. v. Zydus Noveltech, Inc.*, No. 41-1-09 Cncv (Toor, J., Apr. 7, 2015).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

|  |  |
|---|---|
| MYLAN TECHNOLOGIES, INC. and MYLAN INC., <br>   Plaintiffs <br><br> v. <br><br> ZYDUS NOVELTECH, INC., et al. <br>   Defendants | Docket No. 41-1-09 CnC |

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case, one of the oldest in this court, is a dispute between a pharmaceutical company and its former president and his new company. Plaintiffs Mylan Technologies, Inc. and Mylan Inc. (jointly "Mylan")[1] seek partial summary judgment on their claims for (1) breach of contract by Sharad Govil, (2) breach of the covenant of good faith by Govil, (3) tortious interference by Zydus Noveltech and Zydus Technologies, Cadila Healthcare, and Panjak Patel, (4) breach of fiduciary duty by Govil, (5) against all defendants except Sunil Roy for unfair competition, and (6) attorney's fees from Govil under a trade secrets agreement.[2] It also seeks judgment on Govil's counterclaim for breach of contract and Zydus Noveltech's counterclaim for unfair

---

[1] Some of the arguments raised in Defendants' motions turn on which of the Mylan companies did what. Where relevant, the court will make a distinction. Otherwise, it will refer to the two companies jointly.

[2] Mylan's motion does not address Counts Four or Seven of the Second Amended Complaint, which assert claims for violation of the Vermont Uniform Trade Secrets Act and for a constructive trust.

competition. Defendants cross-move for summary judgment on all of Mylan's claims except that for constructive trust.[3]

Facts

The court will not attempt to recite *all* the undisputed facts, and may discuss some in its legal discussion rather than listing them all here. The court notes that although the parties at times state their opposition to certain material facts set forth by each other, under Rule 56 that is insufficient to undercut those facts. V.R.C.P. 56(c)(1)(A). If the opposition does not cite contrary *evidence*, and the proposed fact is supported by evidence, the court deems the fact admitted. V.R.C.P. 56(e).

The general framework of the case is as follows. Beginning in 1992, Sharad Govil was an employee of Bertek, Inc., a company making pressure-sensitive labels. He has a PhD in pharmaceutics and had worked for another pharmaceutical company from 1984 until 1992. That work involved conducting and supervising development of transdermal drug products. He joined Bertek as it was developing its technology into transdermal drug applications: patches that are applied to the skin.

When he joined Bertek, Govil signed an agreement entitled the Trade Secrets and Invention Agreement ("the Trade Secrets Agreement" or "the Agreement"). One of the two owners of Bertek, Alfred Kwiatek, signed the Agreement on behalf of the company. He has testified that he did not see it as a non-compete agreement, only as a confidentiality agreement. Specifically, he asserts that Bertek intended it only to "protect trade secrets and inventions." Kwiatek Dep. at 39. In Kwiatek's view it was not intended to restrict Govil from working in the same industry, "as long as he does not use the processes and the inventions and the trade secrets

---

[3] The court considers a constructive trust to be a remedy, not a cause of action, but as no one has addressed this claim the court will not resolve that question now. *See, e.g*., Weed v. Weed, 2008 VT 121, ¶ 16, 185 Vt. 83 (referring to a constructive trust as an "equitable remed[y]").

of Bertek." Id. Kwiatek told Govil all of this shortly after Govil left Mylan. This was in contrast to Kwiatek's own agreement with Bertek, which barred him from any work in the same field for five years if he left Bertek. Kwiatek has also testified that he intended the Agreement to be assignable if Bertek was sold. Both he and Govil assert that Kwiatek told Govil at the time the Agreement was signed in 1992 that Govil was free to go to work for competitors as long as no trade secrets or confidential information of Bertek were used. Govil also asserts that Kwiatek gave him the example of a nicotine patch, "stating that any employee who left Bertek could work on a nicotine patch elsewhere as long as they did not use Bertek's confidential information and secrets." Govil Aff. ¶ 4 (Oct. 13, 2014). The Agreement contains no language stating that it is assignable. It also contains no language stating that it is *non*-assignable.

Bertek was purchased in 1993 by Mylan Technologies, Inc. (although under a different name initially). Mylan makes and designs transdermal drug delivery systems (commonly known by laypersons as "patches"). When Mylan bought Bertek, the purchase agreement included the assignment of numerous contracts including employee trade secret agreements. Employees were not required to sign new trade secret agreements. There is no evidence that Mylan informed the employees of the document purporting to assign their trade secret agreements.

Govil remained at Mylan Technologies and ultimately became its president. He held that position from 2001 until either February or April of 2006, when he was demoted to Vice President and given a significantly reduced salary. In April 2006 Govil began discussing with Panjak Patel, chairman of Cadila Healthcare, Ltd. (Cadila), possible employment with Cadila. Cadila was based in India, was interested in bringing new drug delivery systems to the United States, and asked if Govil was interested in working on that. Prior to that, Cadila had approached Mylan to work in some capacity (the scope is disputed) with Mylan on transdermal drug

products. The parties disagree over why those discussions ended. Govil says the new president of Mylan who replaced him in 2006 was the one who ended discussions with Cadila; Mylan says Govil was the responsible party.

While still working at Mylan, Govil drafted a detailed proposed business plan for a new company to be started by Cadila, with Govil as CEO. He also negotiated with an ex-employee of Mylan to hire him as CFO of the new venture. On September 21, 2006, Govil signed a 32-page Joint Venture Agreement with Panjak Patel, which outlined the management of the new as-yet-unnamed company.

On September 25, 2006, Govil offered his resignation to Mylan, effective four weeks later. Mylan instead either requested or demanded that it be made effective immediately. Govil agreed. He had stock option agreements that said they terminated immediately upon resignation. He left Mylan to join Cadila. Cadila created Zydus Noveltech ("Noveltech."). Govil, Panjak Patel, and Sharvil Patel were the three directors of the company. Sharvil Patel had no involvement with negotiating Govil's employment agreement with Noveltech.

In 2007 Govil became CEO of Noveltech. When he did so, he disclosed the Trade Secrets Agreement he had signed with Bertek. The employment agreement he signed with Noveltech states that Govil was a party to the Trade Secrets Agreement with Mylan, and listed categories of information that he believed Mylan might consider trade secrets or confidential. That list included the formula for products, the specs for each product including test methods and "quantitate ranges of acceptability," elements of the manufacturing processes that were not publicly known, step by step details of test methods, specific formulations of any development products not publicly known, and test data or test results not in the public domain. The Noveltech employment agreement also stated that Govil "interprets the [Trade Secrets Agreement] to

4

prohibit [Govil] from competing against Mylan only by using Mylan's trade secrets or confidential information." Govil's employment agreement with Noveltech has an indemnification provision that was added to protect him from any lawsuit by Mylan.

Zydus Technologies and Noveltech are involved in the development and manufacture of transdermal drugs. Some of the drugs the companies have worked on developing share the same active ingredient as Mylan's similar products. The Zydus and Mylan companies are both developing generic versions of the same products, and those products would compete against each other. The drug development processes each uses include many of the same steps, including performing intellectual property searches, evaluating patch components, assessing the stability of proposed formulations, optimizing individual ingredients and proposed formulations, performing studies using human beings, and engaging in scale-up processes from lab scales to higher scales. Noveltech has submitted Abbreviated New Drug Applications (ANDAs) to the FDA for four transdermal drug products which it seeks to sell in the United States.

Mylan has identified five alleged trade secrets in this case, after winnowing down a much longer initial list. The court will not list the claimed secrets here, or the very detailed facts set forth with regard to the trade secret claims, but will discuss relevant portions below.

As of the filing of the motions, Noveltech had during 2011-2014 submitted ANDAs to the FDA for Estradiol (once weekly), Clonidine, Lidocaine, Rivastigmine, and Estradiol (twice weekly). All but the Lidocaine have been accepted for filing. Noveltech has no revenue yet from the sale of any transdermal products developed by Cadila or Zydus Technologies. It does not yet have FDA approval to sell any of the products.

## Plaintiff's Motion

### Breach of Contract

Mylan's breach of contract claim turns on the meaning of a poorly drafted agreement entered into between Govil and Bertek in 1992, the Trade Secrets Agreement. It states that it is designed to avoid "the disclosure [or] use of . . . confidential information" of the company. In addition to barring disclosure of trade secrets or confidential information while Govil is employed at Bertek, the Agreement states in relevant part as follows:

> The Employee [Govil] shall not for a period of five (5) years after the termination of his employment with the Company . . . own, manage, control, be employed by, participate in or become associated in any way with any business . . . engaged in the sale, production, manufacture, use, promotion, or development of any product or process . . . the same as or similar to any . . . products or processes of the Company which . . . constitute trade secrets or confidential information of the Company.

The Agreement provides that a release from this provision may be obtained if Govil and the new employer agree in writing that during his new employment Govil will, inter alia, not "use or disclose any trade secrets or confidential information of the Company. . . ." In other words, employment with a company making products similar to "trade secrets or confidential information" of Bertek would be permissible if approved pursuant to such a written agreement.

The Agreement was not a broad non-compete contract: it did not broadly bar *all employment* in the pharmaceutical field. It did not say Govil could not work for any other pharmaceutical company. His employment at another pharmaceutical company would not be restricted at all if that company was not working on "products or processes" that were similar to confidential or secret products or processes of Mylan. It was instead a narrow non-compete contract: Govil was only barred for five years from employment at companies working on products the same as or similar to "trade secrets or confidential information" of Bertek.

6

Govil argues that he was expressly told by one of Bertek's owners when he signed the agreement that he was free to go to work for competitors so long as no protected information was used. In addition, Kwiatek says his intent was only to limit the direct use of trade secrets or confidential information. However, that is not what the document says. The court must enforce the language of the document. Testimony as to intent cannot overcome unambiguous language. "Courts must start with [contract] language and look to circumstantial evidence about intent only when there is ambiguity." Brault v. Welch, 2014 VT 44, ¶ 8, __ Vt. __; *see also*, 11 Williston on Contracts § 31:5 (4th ed.)(Westlaw, updated May 2014)( "[A] court cannot change the words of a written contract so as to make it express the claimed real intention of one or the other of the parties, or remake a contract to implement an alleged but unexpressed intention, if doing so would contradict the clearly expressed language of the contract.").

The questions therefore are (1) did the Agreement pass from Bertek to Mylan, and if so, (2) prior to September 25, 2011 (five years after Govil left Mylan), were the Zydus companies "engaged in the sale, production, manufacture, use, promotion, or development of any product or process . . .  the same as or similar to any  . . . products or processes" that "constitute trade secrets or confidential information of" Mylan?

### 1. Assignment

The Agreement does not say that it is assignable to a purchaser of the Company.  It also does not say that it is non-assignable.

When Mylan bought Bertek, the Purchase Agreement stated that all assets were transferred except those "expressly excluded from the sale" and listed on Exhibit 1.2(4) thereto. That exhibit did not list the Agreement as one of the excluded items. Moreover, the Purchase Agreement expressly listed as assets being transferred all contracts and commitments to which

Seller was a party, and attached a list of those. That list included all employees' Trade Secrets Agreements, and listed Govil as one of the employees. A separate document entitled Assignment and Assumption of Contracts expressly transferred all contracts referred to in that list. Thus, the court concludes that Bertek and Mylan intended assignment when the company was sold. However, whatever the intent of Bertek and Mylan in 1993, if the contract was non-assignable, their intent to assign it would fail. The question is what Bertek and Govil intended in 1992, and/or whether Govil consented to or ratified the assignment.

In determining whether an employment contract is assignable, "[t]he controlling factor is the intention of the parties to the original undertaking." Abilene Pest Control Serv., Inc. v. Hall, 126 Vt. 1, 7 (1966). When a non-compete contract does not contain a clause stating that it may be assigned, that is "some evidence that the intention of the parties was against assignment." Smith, Bell & Hauck v. Cullins, 123 Vt. 96, 101 (1962); *see also*, H. P. Hood & Sons v. Heins, 124 Vt. 331, 339 (1964)("While absence of words of assignability is not necessarily controlling, it is of some significance."). Under Vermont law, a covenant not to compete is considered personal, one based upon the relationship of "mutual confidence." Smith, Bell, 123 Vt. at 101. The fact that an employee is willing to agree to such a clause with one employer whom he trusts does not mean he is willing to do so with another. Id. Thus, a covenant not to compete is "confined to the employer with whom the undertaking was made," is "personal to" the initial employer, and is "incapable of effective assignment without the employee's consent or ratification." Id. at 101-02.

One of Bertek's owners, Mr. Kwiatek, has testified that he intended the Agreement to be transferable to any purchaser of the company. There is no evidence to contradict that testimony as to his intent. It is consistent with how Bertek handled the Agreement when it sold the

company. However, it does not prove that there was a meeting of the minds about that between Bertek and Govil.

Govil does not affirmatively state that he never intended assignment. There is no evidence that he and anyone at Bertek ever discussed the issue when the Agreement was signed. Thus, the court must look to Govil's conduct to determine his intent, and whether he consented to or ratified assignment.

There are many cases finding that employees ratified restrictive covenants by continuing to work for the new ownership, but a review of those cases suggests that they turn on the restrictive covenant being contained within the employee's actual employment contract. Plaintiffs here do not point to any such contract incorporating the Agreement. Instead, it appears to have been a document entered into separate and apart from any employment agreement. Thus, Govil's acceptance of continued employment at Mylan cannot itself be interpreted as consent to assignment or ratification thereof.

However, the key evidence as to Govil's intent is his 2006 employment contract with Noveltech. In that contract, he affirmatively stated that he was currently "a party to an agreement [the Agreement] with Mylan Laboratories, Inc. ("Mylan"). . ." This is an admission by Govil that he had consented to or ratified assignment of the Agreement to Mylan. The employment agreement with Cadila did not say that Mylan might claim that he was a party to the Agreement, it stated that he *was* a party to the Agreement. Moreover, Govil produced only that Agreement to Cadila when asked about any such contracts, because all other contacts "had expired." This demonstrates his acknowledgement that the Agreement was in effect. Further, he contacted Kwiatek after leaving Mylan to discuss the scope of the restrictive covenant.

Govil argues in an affidavit submitted with his motion papers that the assignment did not occur because all Bertek employees were terminated and then rehired by Mylan. Kwiatek testified to this as well. Govil argues that because of this, the Trade Secrets Agreement terminated in 1993. He further argues that because it was an asset sale as opposed to a stock sale, the Agreement was not acquired by Mylan. However, the overwhelming evidence (as recited in Mylan's Opposition to Govil's Motion at 8-13) shows that Govil remained an employee of the company when the ownership changed (as he admitted himself in earlier deposition testimony), his hire date remained at July 1992 in all the company's records, he understood himself to remain as an employee, and that the intent of the sale was to assign the Agreement. In any case, Govil cites no legal authority for the proposition that the nature of the sale undercuts the transfer of the Agreement. To the contrary, where there is a "transfer of corporate assets by sale," the new company "shall possess all the rights, privileges and benefits of the original corporation properly exercisable under the laws of this state." Abilene Pest Control, 126 Vt. at 6; *see also*, Chemetall GMBH v. Zr Energy, Inc., No. 99 C 4334, 2000 WL 1808568, *2 (N.D. Ill. Dec. 6, 2000)("A successor corporation in an asset purchase can enforce confidentiality agreements and covenants not to compete that an employee signed with its predecessor corporation."); Booth Waltz Enterprises, Inc. v. Pierson, No. CV094008249S, 2009 WL 566263, * 2 (Conn. Super. Ct. Feb. 4, 2009) (sale of assets included transfer of non-compete).

Govil argues that neither he nor Kwiatek interpreted the Agreement as a non-compete, only as a confidentiality agreement, so even if it was either intended that it be assignable, or Govil ratified the assignment, all that could be assigned was the confidentiality agreement they believed it to be. The court disagrees. If they both intended the Agreement to be assignable, or

10

ratified that assignment, and on its face it says that it is a non-compete (albeit a limited one), their unreasonable contrary interpretation does not make it non-assignable.

Based upon the above, the court concludes that no reasonable jury could find that the Agreement was not assigned to Mylan.

## 2. Trade Secrets/Confidential Information

The next question is whether during the five years after Govil left Mylan (2006-2011) the companies he worked for were "engaged in the sale, production, manufacture, use, promotion, or development of any product or process . . . the same as or similar to any . . . products or processes of the Company which . . . constitute trade secrets or confidential information of the Company."

There is no question but that Noveltech is in the same business as Mylan. They are competitors in the field of transdermal generic drugs. That is not the only issue, however. The question is whether the undisputed facts prove that the "products or processes" Noveltech is using are "the same or similar to" ones that are Mylan's "trade secrets or confidential information." The mere fact that the two companies are developing similar drugs is not enough: Mylan must prove that there are trade secrets or confidential information involved. Given that both companies are developing generics, which are copies of other companies' drugs, this is not a foregone conclusion.

Mylan's statement of undisputed facts summarizes these claims in a few paragraphs. Plaintiffs' Statement of Material Facts (Ptfs.' SMF) ¶¶ 9-10, 41. Defendants dispute those claims, citing contrary evidence. Govil agrees there are *categories* of information (e.g., formulas, specifications, marketing and sales plans, test data, market research results) that would be Mylan's trade secrets or would be confidential. He does not identify exactly what constituted

11

such trade secrets or confidential information, and Govil does not concede that Noveltech was developing products similar to Mylan's trade secrets or confidential information. Saying that formulas as a category are confidential is not the same as saying "this particular formula was confidential, and Noveltech used a similar formula."

Govil concedes in his deposition that the fact that Mylan was developing Lidocaine and Estradiol (twice weekly) would have been confidential if not yet public information, and that he does not know whether that was public when he left Mylan. The Hango Affidavit states that the fact that Mylan was developing an Estradiol (twice weekly) generic in 2005 was "kept strictly confidential" and was not publicly known until 2011. However, Defendants' expert, Dr. David Enscore, is of the opinion that " the knowledge that these . . generic products were desirable to pursue in 2006 was not confidential," Enscore Aff. ¶ 10, and one of Mylan's employees testified that Mylan decided to pursue Estradiol and Lidocaine because there was a successful product for each already on the market. Beste Dep. at 40-41.

Moreover, the Agreement talks about "processes and products" that were confidential, not *all information* that was confidential. It might have been confidential that Mylan was going to paint its building purple, but that would not make purple paint a confidential product or process. If Mylan made donuts, under the Agreement the recipe would be a confidential process but it would not mean that all donuts, made with entirely different ingredients and in an entirely different way, were "the same as or similar to" Mylan's donuts. Nor would the fact that Mylan was secretly planning on moving into the donut market mean that all donuts were off limits. The product or process must be confidential or a trade secret; the fact that it is a secret that the company plans to make a product of that type does not make all such products of that type verboten. Mylan argues that the Agreement means that if Mylan was planning to make donuts,

12

and no one else knew that, Govil could not work at any company making donuts – even though the donut recipes or equipment used to make the donuts were not "the same as or similar to" any recipes or equipment of Mylan's. The court does not read the Agreement that way.

The record on these issues is insufficient for summary judgment. The court concludes that there remain disputed issues of fact that must be decided by a jury.[4]

## Breach of the Covenant of Good Faith

The claim for breach of the covenant of good faith is asserted against Govil, and is based in part upon claims that Govil diverted Cadila's interest in Mylan for himself, intentionally hid his negotiations with Cadila, lied about whether he had new employment, and continued to obtain confidential information at Mylan while he knew he was leaving to join Cadila. An employee is entitled to have negotiations with a new employer without disclosing them to his current employer, and has no legal duty to tell the first employer where he is headed when he leaves. Restatement (Third) of Agency § 8.04 cmt. c ("[A]n employee or other agent who plans to compete with the principal does not have a duty to disclose this fact to the principal."). Thus, the issue boils down to whether he diverted Cadila's interest in Mylan for himself, and whether he purposely obtained (and used) confidential information once he knew he was leaving. Mylan has not established these facts, and thus summary judgment for Mylan is denied.

## Tortious Interference

The tortious interference claim is asserted against all defendants except Govil. It alleges that those defendants knew of the Trade Secrets Agreement and Govil's contractual obligation

---

[4] Govil also argues that summary judgment for Mylan must be denied because Mylan has not shown that the Agreement imposes no greater restraint than necessary. The argument is based upon a broader reading of the Agreement than the court's reading. Based upon the latter, the court cannot say that the Agreement is unreasonable as a matter of law. If there are actually trade secrets or confidential information, some restriction is obviously reasonable. Five years is not on its face unjustifiable. The reasonableness of the restriction may depend to some extent on what secrets are established at trial.

not to disclose confidential information or trade secrets; that they intentionally interfered with the contractual relations between Mylan and Govil by recruiting and hiring Govil into a competing business which would cause him to breach the Agreement, and by creating a joint venture with him. These claims turn in part on whether Govil has actually breached the Agreement, and thus cannot be resolved until that claim is resolved. Moreover, the Defendants' intent must be proven. Williams v. Chittenden Trust Co., 145 Vt. 76, 80-81 (1984). Until it is clear that there were trade secrets and/or confidential information that were at issue, there can be no finding that there was an intent to cause a breach of the Agreement. The record does not adequately resolve this question. Mylan's request for summary judgment on this claim is denied.

<u>Breach of Fiduciary Duty</u>

Govil is alleged to have breached his fiduciary duty to Mylan. With one exception, the facts supporting this claim are the same as those supporting the claims of breach of the duty of good faith – that Govil diverted a venture intended for Mylan, and used Mylan trade secrets or confidential information in doing so. Like the other claims, these cannot be resolved now because there are disputed facts at issue.[5]

The exception is the claim that Govil provided services to Cadila while he was still employed by Mylan. "Throughout the duration of an agency relationship, an agent has a duty to

---

[5] Mylan argues that even if it had abandoned all negotiations with Cadila before Govil began discussions with Cadila, there was still a breach of fiduciary duty. The two cases Mylan cites which the court can locate – it does not have access to the Lexis citation – do not speak so broadly. Instead, they involved situations where the fiduciary was aware that the company was still interested in the proposal, even though the first offers had been rejected. Regal-Beloit Corp. v. Drecoll, 955 F. Supp. 849, 861 (N.D. Ill. 1996)(Corporation "remained extremely interested in purchasing Brad Foote, even after its first acquisition attempt was unsuccessful."); Lindenhurst Drugs, Inc. v. Becker, 506 N.E.2d 645, 651 (Ill. App. Ct. 1987)("[I]t is undisputed that plaintiff remained interested in purchasing the Ben Franklin store franchise."). Other cases support Govil's position. *See, e.g.*, Engenium Solutions, Inc. v. Symphonic Technologies, Inc., 924 F.Supp.2d 757, 793 (S.D. Tex. 2013)(Corporation's "abandonment of the business opportunity [is a] defense[] to a charge of usurpation of corporate opportunity."). Moreover, Govil argues that the nature of the proposal to Mylan was different from the proposal to him, and this remains a disputed factual issue. If the two things did not involve the same "corporate opportunity," there would presumably be no breach of duty.

refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors. During that time, an agent may take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship." Restatement (Third) of Agency § 8.04.

The undisputed facts show that while still working at Mylan, Govil met several times with Cadila, negotiated to hire the future CFO of Noveltech, selected Estradiol (twice weekly), Clonidine, Fentanyl and Lidocaine as products for the Cadila/Zydus companies to develop transdermally, and signed a joint venture agreement with Cadila three days before leaving Mylan. Ptfs.' SMF ¶¶ 37, 40.[6] As early as May 2006 – four months before he left Mylan – there was a business plan that identified Govil as the CEO of the planned company. Govil Dep. Ex. 12. It did not list exact drugs to be developed, but categories of such drugs (e.g., "female hormone replacement therapy" and "pain"). However, Govil explained at his deposition that such references were to the specific drugs referenced above. Govil Dep. 173-74.

If Govil worked Saturdays for an in-law running a corner store, that would not be a breach of fiduciary duty even though he was doing this second job while employed by Mylan. Here, however, it is undisputed that Mylan and Noveltech are competitors in the same field. Thus, the question is whether Govil was (1) competing with Mylan, or assisting Cadila to do so, while still employed at Mylan, or (2) merely preparing to compete.[7]

---

[6] Defendants claim that Govil did not sign a joint venture agreement, but a "memorandum of understanding which was labeled as a joint venture agreement." Defs.' Joint Opp'n to Ptfs.' SMF ¶ 37. The court rejects this overly technical distinction and concludes that any jury would do the same. The document is entitled "Joint Venture Agreement." Enough said.

[7] Doing other work might also become a breach of duty if it is on company time or interferes with the employee's work. There is no evidence presented that Govil did work for Cadila on company time. While there is evidence that, for example, he travelled to India for meetings, there is no evidence as to whether he took vacation time or other leave time to do so. Nor is there evidence that work he did for Cadila actually interfered with his ability to do his work for Mylan.

15

There can be a fine line between negotiating a new job – preparing to compete – and actually competing. SJS Refractory Co., LLC v. Empire Refractory Sales, Inc., 952 N.E.2d 758, 768 (Ind. App. 2011) ("[A]n employee who plans to leave his current job and go into competition with his current employer must walk a fine line."). However, "at-will employees may plan to compete with their employer even while still employed there and may freely compete with the employer once they are no longer employed there." Omega Optical, Inc. v. Chroma Technology Corp., 174 Vt. 10, 18 (2002). As the court explained in SJS Refractory, "although an employee may not actively and directly compete with his current employer, he may prepare to do so without breaching his fiduciary duty of loyalty." 952 N.E. 2d at 768. Thus:

> Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer. An employee may make arrangements to compete with his employer, such as investments or the purchase of a rival corporation or equipment. However, the employee cannot properly use confidential information specific to his employer's business before the employee leaves his employ. These rules balance the concern for the integrity of the employment relationship against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty.

Id. "Many employees and other agents who compete with their former principals do not terminate the agency relationship before commencing activity requisite to their eventual competition." Restatement (Third) of Agency § 8.04 cmt. c. However, it can be "difficult to draw a clean distinction between actions prior to termination of an agency relationship that constitute mere preparation for competition, which do not contravene an employee's or other agent's duty to the principal, and actions that constitute competition." Id. This is in part because "actions may be proper or improper, depending on the intention with which the agent acted and the surrounding circumstances." Id. As another court has noted, "these types of cases are extremely

16

fact-sensitive." Potts v. Review Bd. of the Ind. Emp. Sec. Div., 475 N.E.2d 708, 712 (Ind. Ct. App.1985).

If Govil was, while working at Mylan, sharing confidential information in violation of the Trade Secrets Agreement, that would be a breach of fiduciary duty, but that issue remains for trial. Setting that issue aside, Govil was not actually "competing with" Mylan merely by discussing new product plans with Cadila. Nor does it necessarily cross the line to have repeated meetings with the future employer. Although Govil created the detailed business plan for Cadila while he still worked for Mylan, and signed the joint venture agreement, an employee may even purchase a rival company without violating his duty. The new company did not even exist until 2007: the Joint Venture Agreement that Govil signed four days before leaving Mylan was merely a plan to set up the new venture: it did not yet exist. Thus, the court concludes that Govil was preparing to compete, not actually competing. By doing so, he did not breach his fiduciary duty. The other aspects of this claim remain for trial.[8]

### Unfair Competition

Mylan alleges that all Defendants engaged in unfair competition by conspiring to violate the Trade Secrets Agreement and "conceal the creation of Zydus so as to prevent [Mylan] from enforcing its contract rights." Second Amended Complaint, ¶ 90. The complaint also alleges that the Defendants conspired to conceal their discussions while Govil was still employed at Mylan. Id. For this argument they rely upon the idea that "deception" can be unfair competition. Mem. in Supp. of Ptfs.' Mot. at 45. However, merely failing to tell an employer that its employee is negotiating to leave and start, or join, a new company is not deception: it is common business practice. *Accord*, Restatement (Third) of Agency § 8.04 cmt. c ("[A]n employee or other agent

---

[8] Govil argues that Plaintiffs cannot show damages. That, too, is an issue for trial.

17

who plans to compete with the principal does not have a duty to disclose this fact to the principal.").

The documents Mylan cites may suggest that employees at Noveltech were trying to keep Govil's name out of public references, but that alone does not prove that there was unlawful deception going on. In any case, Defendants proffer an explanation for at least one of the documents. While not greatly persuasive, the explanation is at least arguable. It is thus a question for the jury, not the court. "The ultimate assessment of the inferences is for the jury rather than the court, unless reasonable minds could not differ . . . ." Clarke v. Abate, 2013 VT 52, ¶ 21, 194 Vt. 294. The court denies summary judgment for Mylan on this claim.

### Govil's Counterclaim for Breach of Contract

Mylan argues that it is entitled to summary judgment on Govil's counterclaim for breach of contract. Govil's claim is that Mylan has improperly refused to let him exercise his stock options. The Stock Option Agreements say that they terminate immediately upon resignation for any reason other than retirement or disability. Govil Dep. Exs. 64-65. Although Govil argues over whether he had the agreements in hand when he tendered his resignation, he does not dispute what they say. Instead, he argues that a Mylan employee told him he would have thirty days to exercise the options, and that Mylan improperly pressured him into resigning earlier than he intended – after threatening to "make his life miserable" if he was going to a competitor. Govil argues that this was a breach of the covenant of good faith and fair dealing. However, his counterclaim asserts only a claim for breach of contract, not for breach of the covenant of good faith. They are two different claims. Govil has offered no evidence of the claim he did make: that the stock option contract was breached. Thus, the court grants summary judgment for Plaintiffs on this counterclaim.

18

<u>Noveltech's Counterclaim for Unfair Competition</u>

Mylan seeks summary judgment on Noveltech's counterclaim for unfair competition. The claim is that Mylan "has initiated and maintained this action without probable cause, with no good-faith basis, with knowledge that the allegations and claims are without foundation, and with the knowledge and intent to burden and disrupt" Noveltech's business. Counterclaim ¶ 140. A groundless lawsuit intended to interfere with a competitor's business can be the basis for a claim of unfair competition. Restatement (Third) of Unfair Competition § 1 cmt. g.

Mylan argues, however, that the <u>Noerr-Pennington</u> doctrine mandates dismissal. As the court noted in an earlier ruling on this issue:

> The doctrine, in its simplest form, provides that the First Amendment right to petition the government protects litigants from liability for filing lawsuits, unless the lawsuits are found by a court to be "shams." <u>B E & K Constr. Co. v. N.L.R.B.</u>, 536 U.S. 516, 524-25 (2002). This is referred to as "<u>Noerr-Pennington</u> immunity," meaning that a litigant is immune from liability for seeking non-sham redress in the courts.

Ruling on Motion to Dismiss Counterclaims at 8 (May 17, 2011). Although it originated in the antitrust world, "it has been extended to provide protection from unfair competition claims." <u>ICOS Vision Systems Corp., N.V. v. Scanner Technologies Corp.</u>, No. 05 Civ. 6322(DC), 2006 WL 838990, *4 (S.D.N.Y. Mar. 29, 2006). This court concluded earlier, and does not change its view now, that the doctrine should be applied to such claims in Vermont.

To overcome <u>Noerr-Pennington</u>, Zydus must show two things: (1) that the lawsuit is objectively baseless, in that "no reasonable litigant could realistically expect success on the merits," and (2) that this suit was "an attempt to interfere directly with the business relationships of a competitor through the use [of]" the court process. <u>Prof. Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.</u>, 508 U.S. 49, 60-61 (1993) (emphasis omitted)(citations and internal quotation marks omitted). "[T]he filing of a frivolous lawsuit to delay a competitor from

bringing a product to market would constitute a sham." <u>BCD, LLC v. BMW Mfg. Co., LLC</u>, No. 6:05-CV-2152-GRA, 2008 WL 304878, * 14 (D.S.C. Jan. 31, 2008), *aff'd*, 360 Fed. Appx. 428 (4th Cir. 2010).

As the court noted before, the first issue requires either a trial or a finding on summary judgment that the case is frivolous. However, the fact that Mylan survives summary judgment against it does not necessarily put the claim to rest. As the court previously ruled, it believes that this issue should await resolution because the facts as presented on summary judgment may turn out to be unsupported at trial. If necessary at that time, the court will determine whether there were any misrepresentations to the court by Mylan as alleged by Noveltech.

Mylan's Request for Attorney's Fees

The court considers the issue of attorney's fees under the Trade Secrets Agreement to be premature, as it will depend upon the outcome of the case at trial.

**Govil/Noveltech Motion**

Govil and Noveltech move for summary judgment in their favor on all claims against them. Some of the court's discussion above in the context of Mylan's motion addresses issues raised in the Govil/Noveltech motion, and the court will not repeat those discussions here.

Breach of Contract

Damages

Govil argues that the breach of contract claim cannot succeed because Mylan cannot prove any damages. First, he argues that the Trade Secrets Agreement on which this claim rests is only with Mylan Technologies, and that company has no income from the drugs in question – and thus cannot suffer any damages from lost profits. It is undisputed that Mylan Technologies is the party to the Agreement, and that its products are sold through Mylan Pharmaceuticals. The

20

details of the accounting between the two, and whether Mylan Technologies makes any profit on the sale of its transdermal products, are disputed. This is not an issue the court can resolve on summary judgment. The companies are obviously intertwined and the factual record is insufficient to sort out the details.

The next argument is that any damages from breach of contract here are too speculative, because there are too many unknown factors. Mylan has not obtained FDA approval yet for Estradiol (twice weekly) or Lidocaine, and thus may never be able to market them or have any income from them. For the products already approved, the sales projections have many assumptions, such as that there will be no supply issues, costs will remain essentially the same, and there will be no competing entrants into the market. Govil thus argues that any damages are unrecoverable under the "new business" rule.

That rule is that "evidence of expected profits from a new business is too speculative, uncertain, and remote to be considered and does not meet the legal standard of reasonable certainty." Berlin Dev. Corp. v. Vt. Structural Steel Corp., 127 Vt. 367, 372 (1968). "The rule is clearly established in Vermont that breach-of-contract damages must be proved with reasonable certainty." Madowitz v. Woods at Killington Owners' Ass'n, Inc., 2014 VT 21, ¶ 14 (internal quotation marks and citation omitted). "Consequently, 'recovery for lost profits is not generally allowed for injury to a new business with no history of profits.'" Id. ¶ 15, quoting Berlin at 372. Govil/Noveltech argues that this also applies to as-yet-unlaunched products of an existing business. The court agrees. "[T]he new business rule applies with equal force to new products which create potential new business for the entity." TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc., 491 F.3d 625, 634 (7th Cir. 2007).

Here, although Mylan is in the business of selling pharmaceutical transdermal products, the Estradiol (twice weekly) and Lidocaine products are not even approved by the FDA for sale yet. Just as in <u>Madowitz</u>, "it is entirely speculative that [Mylan] would have completed, or even started, [selling its planned products]" by any particular date. 2014 VT 21, ¶ 19. Mylan may never receive approval and thus may never have any possible income from these products. Thus, the court agrees that the contract claim for damages based upon Estradiol (twice weekly) and Lidocaine cannot succeed.

With regard to Mylan's existing products, Govil argues that there are too many assumptions to support damages: such as the assumption that there will be no other entrants into the market to compete with these products. However, this would essentially be true about any claim for future profits, even of a longstanding and successful business. A new competitor may appear at any time; costs may suddenly go up; other unexpected events may change the profit picture. But a going business has a track record on which to project reasonably likely future sales. We do not deny them all claims for lost profits because of the possibility of change. This is not to say that the Defendants could not present evidence at trial to show that the likelihood of changes outweighs the likelihood of business-as-usual, but to date they have not done so. Thus, damages for projected losses to Mylan's existing product line are not too speculative to seek.

However, Govil argues that the damages also fail because the claim assumes that Noveltech will actually get approval for and succeed in marketing the competing products. Without such sales, there will be no losses to Mylan. As with the Estradiol (twice weekly) and Lidocaine, it is entirely speculative whether the FDA will approve Noveltech's products and whether Noveltech will ever be an actual competitor to Mylan on any of the drugs in question. Thus, there is no way for a jury to calculate any lost profits that Mylan will suffer as a result of

sales by Noveltech. Any such calculations would be pure speculation. Although Mylan complains that Noveltech has not provided its own calculations of likely profits, that would be no more useful to the jury. If the products never launch, there are no losses to Mylan. No set of calculations can overcome that gap in the evidence.

However, the parties appear to agree that even without any actual damages, Mylan would be entitled to nominal damages if it proved its breach of contract claim. Herrera v. Union No. 39 Sch. Dist.,2006 VT 83, ¶ 21, 181 Vt. 198. Thus, the court cannot grant summary judgment on this entire claim. The court will, however, limit the damages on this claim to nominal damages.[9]

## Overbreadth

Govil/Noveltech argue that the Agreement is overbroad and thus unenforceable, because it is unnecessarily restrictive. The court agrees that, as Mylan interprets the Agreement, it would be overbroad and unenforceable. However, as the court has explained above, it does not read the Agreement so broadly. A five year restriction on working on a competing product or process is not unreasonable as a matter of law to protect trade secrets and confidential information.

## Breach of Fiduciary Duty

Govil argues that he is entitled to summary judgment on the breach of duty claim because Mylan abandoned the opportunity to work with Cadila. The evidence of this is testimony by a Mylan executive that after meeting with Cadila, Mylan thought that Cadila was "very immature in their development [and] we . . . didn't see anything that we felt would make sense to Mylan Technologies at that point." Caron Dep. at 87. Caron further testified that the President of Mylan agreed with that assessment.

---

[9] Of course, this could potentially change if Noveltech receives FDA approval between now and trial.

23

Mylan argues that even if it abandoned the opportunity, the case law supports its claim. The court disagrees, as noted above. *See supra* n 5. However, the court finds the evidence on this is disputed because Caron did not state that the company actually made a decision to abandon any discussions with Cadila, he appears to have been a party to only one conversation when the evidence suggests there were more, and Mylan points to other evidence suggesting that Govil was never told that Mylan had abandoned the idea.

Govil also argues that the discussions with Mylan related to an entirely different business model than the one that he and Cadila ultimately created. Again, the court finds the facts on this issue disputed.

Finally, Govil argues that Mylan cannot show any damages from the alleged breach. Mylan seeks disgorgement of Govil's pay from Mylan during the period he was negotiating with Cadila while still employed there, under what has been called the "faithless servant" doctrine. Vermont has not addressed this doctrine one way or the other, but it has been used in other jurisdictions.

Generally, to establish a claim for breach of a fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary duty, (2) knowing breach of that duty, and (3) damages from that breach. *See, e.g.*, Johnson v. Nextel Communications, Inc., 660 F. 3d 131, 138 (2d Cir. 2011); People ex rel. Harris v. Rizzo, 154 Cal. Rptr. 3d 443, 469 (Cal. Ct. App.2013); *accord* Cooper v. Cooper, 173 Vt. 1, 17 (2001)(listing elements of claim for assisting another in violating a fiduciary duty). "Once the breach of a fiduciary duty has been established, the plaintiff must prove the damage resulting from the breach." 3 Fletcher Cyclopedia of the Law of Corporations, § 860.50 (WL updated April 2014); *accord* Cooper, 173 Vt. at 17 (Where claim is for assisting

another in violating a fiduciary duty, elements of proof include "that the plaintiff suffered damage as a result of the breach.").

Here, Mylan does not argue that it has been directly damaged by the alleged breach of duty. There is no claim that it would have entered into a joint venture with Cadila and profited therefrom, for example. Instead, Mylan asks this court to permit it to draw back Govil's compensation for the period of the alleged breach of duty. Under the "faithless servant" doctrine, an employee who breaches a duty to his employer may be required to forfeit some or all of his salary from the employer. *See, e.g.*, Bailey v. Fast Model Technologies, LLC, No. 10–15118, 2012 WL 2601882, * 2 (E.D. Mich. 2012)("Michigan courts have long recognized that an agent may forfeit his or her right to compensation under a contract for services when the agent engages in misconduct or grossly mismanages his principal's affairs"); Bessman v. Bessman, 520 P.2d 1210, 1215-20 (Kan. 1974) ("[A]n agent who realizes a secret profit through his dealings on behalf of his principal not only must disgorge the profit but forfeits the compensation he would otherwise have earned."). Even without the terminology of "faithless servant," there is other authority to support this as a measure of damages for breach of fiduciary duty by a corporate officer. *See, e.g.*, 5A Fletcher Cyc. Corp. § 2145 (WL updated Sept. 2014) ("It is one of the fundamental principles of agency that an agent guilty of misconduct and fraud in relation to the transaction of the principal's business is not entitled to compensation for his or her services.").

This doctrine has not been expressly adopted by the Vermont Supreme Court – a not uncommon state of affairs in this jurisdiction. However, it has also not been expressly rejected. It appears to be a rational way to penalize an employee for his or her wrongdoing when alternative measures of damages are not available. The court will not grant summary judgment on this claim

merely because no Vermont case has yet adopted the theory. Numerous courts have addressed the issue, and the fact that it has not come up before is not alone a reason to disavow it. Although Govil describes it as "controversial and inequitable," he actually cites nothing analyzing why it should be seen so. As one court notes, where it is applied "[e]ach case must be determined in the discretion of the court with reference to the peculiar factors found to be present." Gemini Networks, Inc. v. Nofs, No. CV030824652, 2004 WL 113622, * 1 (Conn. Super. 2004) (citation omitted). The court will await the facts as they play out at trial to determine whether the doctrine is properly applied here.

Tortious Interference

Noveltech seeks summary judgment on the claim of tortious interference for several reasons, some of which depend upon the breach of contract issues addressed above, which await trial. It also alleges there is no proof of Noveltech's bad intent. "To establish liability for this tort, [Mylan] must show that [Noveltech] intentionally and improperly induced [Govil] not to perform [his] contract." Gifford v. Sun Data, Inc., 165 Vt. 611, 612 (1996). "Intent to interfere with a contractual relationship exists if the actor acts for the primary purpose of interfering with the performance of the contract," or if the actor "knows that interference will be substantially certain to occur as a result of his or her action." Williams v. Chittenden Trust Co., 145 Vt. 76, 80-81 (1984)(internal quotation marks and citation omitted). In determining whether the acts were "improper," the court must look at "the motives and actions of [Noveltech], the relations of the parties, and their respective interests." Gifford, 165 Vt. at 612.

Mylan's claim is that Defendants interfered with Govil's obligations under the Trade Secrets Agreement. However, Noveltech specifically negotiated an employment agreement that bars Govil from violating the Agreement, had lawyers review the documents, and had Govil list

26

what he believed Mylan might consider to be trade secrets. Patel told Govil he did not want Govil to "do anything with what you've done previously." Patel Dep. at 160. That comment was rather vague, and there certainly could have been much more done to assure no crossover of information, the evidence is nonetheless that Defendants were attempting to avoid having Govil breach the Agreement. As this case has demonstrated, the poorly drafted Agreement certainly left room for confusion over exactly what items it might cover. Its wording is not ambiguous, but exactly what products or processes it covers are, as a factual matter, extremely unclear.

Ultimately, Mylan offers no evidence beyond its claim that Noveltech had to know from the language of the Agreement that hiring Govil would make him breach it. This rests on Mylan's view that developing any transdermal drug that might compete with one of its products is automatically a violation of the Agreement. As discussed above, the court cannot agree. Any donut is not necessarily a forbidden donut. It requires proof that there is a trade secret or confidential information at issue. There is just no evidence here that Noveltech intended to, or knew it was substantially certain to, cause Govil to breach the Agreement. Nor does the fact that Defendants did not fire Govil or change their product lines after accusations were leveled against them by Mylan add any actual proof to this claim. The court grants Noveltech summary judgment on this claim.

Trade Secret Misappropriation

Mylan asserts a claim of trade secret misappropriation against all Defendants under 9 V.S.A. §§ 4601-09. That statute provides for injunctions against misappropriation of trade secrets, payment of royalties in exceptional circumstances, and damages. Id. §§ 4602-03. It provides a lengthy definition for the term "misappropriation" and defines "trade secret" as follows:

27

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. § 4601(3). "In general, liability for trade secret misappropriation in the employment context requires proof of both the existence of a trade secret as well as unauthorized disclosure or use of the secret in breach of a duty of confidence." Omega Optical, Inc., 174 Vt. at 13.[10] To be liable for misappropriation, an employee must have reason to know the information is a trade secret that he has a duty to protect. Id. at 14. "Information that is public knowledge or that is generally known in an industry cannot be a trade secret." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984). However, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990) (citation omitted).

"The existence of a trade secret is a conclusion of law based on the applicable facts. However, if the facts the Court uses to determine whether information constitutes a trade secret are disputed, the finder of fact must first resolve those disputes." Sarkissian Mason, Inc. v. Enter. Holdings, Inc., 955 F.Supp.2d 247, 255 (S.D.N.Y. 2013)(internal quotation and citation omitted).

---

[10] *See also*, U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc., 865 S.W.2d 214, 218 (Tex. App.1993) (The elements of misappropriation are: "(i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition ( i.e., a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff."); Mercury Record Prod., Inc. v. Econ. Consultants, Inc., 218 N.W.2d 705, 710 (Wis. 1974) ("[T]he essence of the cause of action in misappropriation is the defendant's use of the plaintiff's product, into which the plaintiff has put time, skill, and money; and the defendant's use of the plaintiff's product or a copy of it in competition with the plaintiff and gaining an advantage in that competition because the plaintiff, and not the defendant, has expended the energy to produce it.").

28

<u>Public Domain</u>

Mylan has alleged five trade secrets as being at issue here. Three are described as "the research and stability testing during formulation development" to arrive at certain percentages or formulations of ingredients. Ptfs' SMF 57. Specifically, they relate to concentrations of CSD (colloidal silicon dioxide) and PVP (povidone) in Mylan's weekly Estradiol. Defendants argue that these have been disclosed in patent applications, Mylan's product labeling, and textbooks, and therefore cannot be considered secret. Mylan responds that the patents and textbooks address general principles but not the detailed formulations at issue, and that the label is for an earlier product. For example, Mylan says that the patent is for a patch different from the once weekly Estradiol product, and that when they developed Estradiol (twice weekly), they added two ingredients that were not in their prior patent for the same drug. Thus, they say, the fact that part of the recipe was public does not mean the additional ingredient formulation was not a secret.

However, whether Mylan's own drugs were the same is not the issue. The issue is whether Noveltech stole their trade secrets. The first two trade secrets Mylan alleges relate to the formulations of the once weekly Estradiol, and are listed as approximately 1% CSD and approximately 4% PVP. (Trade Secrets 1 and 2). The 2004 patent application lists even more detail: 1.13% CSD and 3.4% PVP. To argue that how Mylan came up with "approximately 1%" and "approximately 4%" is a secret when the exact percentages are public in their patent application is unconvincing. Likewise, the package insert for Mylan's weekly Estradiol lists CSD and PVP as ingredients, although not the percentages. It is also undisputed that other publications had discussed the usefulness of PVP and CSD for the purposes for which Noveltech has used them. The mere fact that these ingredients have been used by both Mylan and

Noveltech is not a basis for sending these issues to the jury. The court grants summary judgment to Defendants on Trade Secrets 1 and 2.

With respect to Trade Secret 3, Defendants argue that the patent application also discloses the combination of "CSD and an acrylate adhesive." However, the court cannot tell from the facts provided whether that is the case. The court finds the facts disputed on this issue.

Mylan describes Trade Secret 4 as "the identification of CSD as the cause of streaking and spots in dried laminates and the use of an inline filter to filter or screen the coating solution prior to the coating application as a specific process improvement to address such problems in the manufacture of Mylan's Estradiol (one weekly) transdermal product." Defendants argue that inline filtration is a common technique explained in textbooks to prevent streaking during coating operations. Mylan responds that the general concept may be out there, but not the idea of applying it to address streaking of CSD or using it in producing an Estradiol product. Again, the court finds there are disputed facts. *See* Ptfs.' Resp. to Defs.' SMF ¶¶ 97-100 and Ptfs.' Additional SMF ¶ 189.

Trade Secret 5 is described as "the use of Drakeol 7 grade mineral oil in the formulation of Mylan's clonidine transdermal drug product as an excipient and the knowledge that it's [sic] use would be compatible and stable with the overall drug formulation." Defendants argue that Mylan's 1999 patent for a clonidine patch addresses the viscosity range applicable to Drakeol 7. Plaintiff's expert testified that someone could figure out the idea of using Drakeol 7 based upon the need for that viscosity. Shivanand Dep. at 158-9. Mylan responds that "someone could have" is not the same as "someone did." That may be true, but it is Mylan's burden to prove that the information is actually a secret that is not "readily ascertainable" by others. If the information was "readily ascertainable" by others, it was not a trade secret. 9 V.S.A. § 4601(3). Mylan does

not deny that its 1999 patent listed exactly the viscosity applicable to Drakeol 7, and thus that fact was in the public domain. Mylan proffers no evidence that its choice of Drakeol 7 was itself a trade secret. The court grants summary judgment on this issue.

Independent Development

Defendants argue that there is no evidence that Defendants took their ideas from Mylan as opposed to developing them independently, and they point to evidence of independent development. What remain at issue for this discussion are Trade Secrets 3 and 4. Trade Secret 3 relates to Mylan's Estradiol (once weekly). It is described as the "research and stability testing during formulation and development" that led to the choice of "specific concentrations of both CSD and PVP . . and in connection with the use of an acrylate adhesive." Trade Secret 4 is the "identification of CSD as the cause of streaking and spots in dried laminates and the use of an inline filter to filter or screen the coating solution. . . ."

Defendants argue that even if their products are similar, there is no proof they came from Mylan's testing. The two companies' Estradiol (once weekly) are not identical. Where they share the same ingredients, the percentages are different.[11] Each also has ingredients the other does not. The ingredients Noveltech uses, but Mylan does not, come from another company's patent that expired in 2010. The patches also have different physical design: Mylan's has a "double disk" to improve adhesion, whereas Noveltech's has a "single disk." Likewise, the Clonidine of each company is different, both in ingredients and in disk design. Mylan's expert, Dr. Shivanand, did not tally up the similarities and differences in the two companies' products. Nor has she stated that Noveltech used Mylan's "research and stability testing."

---

[11] The court again notes that merely saying a fact is "disputed," as Mylan has done for a number of the facts set forth here, does not satisfy Rule 56. *See, e.g.*, Ptfs.' Resp. to Defs.' SMF ¶¶ 105-113. The court has thus deemed such facts admitted.

31

Defendants have proffered testimony from Govil and other employees about how they came up with various elements of their products, and denying that they used any confidential Mylan information. For example, one employee testified that Defendants based their Estradiol (once weekly) on Climara, a branded product with a patent set to expire in 2010. Another testified that they developed Clonidine based upon expired patents for another drug, Catapres TTS. The history of how these drugs were developed by Defendants is set forth in detail in an affidavit from Dr. Abhay Sapre. The same witness explained how Defendants determined that CSD was causing streaking problems. Defendants had used an inline filter in a prior product. The history of how the Drakeol oil was selected is explained in detail in the affidavit of G. Kevasan, backed up by contemporaneous emails. Govil states that he never instructed anyone to try CSD, told them what to do about streaking of laminates, or advised them what mineral oil to use in the Clonidine patch.

Mylan's response to all of this testimony about independent development is that it is inconsistent, leaves out information about testing that would have been necessary, includes no documents articulating the origin of the ideas, and fails to "provide an eyewitness account of the origin of each idea." Ptfs.' Opp. to Govil/Noveltech Motion at 49-50. In essence, Mylan's point is that the testimony from Defendants' witnesses is not credible, that the similarities between the products are suspicious, and it should be permitted to present that claim to a jury.

Mylan is of course correct that circumstantial evidence can be sufficient to prove a case, and that incredible allegations are not enough to support summary judgment. It is also true that credibility is a question for the jury, not for the court on summary judgment. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [the judge] is ruling on a motion for

summary judgment or for a directed verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In addition, the court must give Mylan, the non-moving party, the benefit of all reasonable doubts and inferences. Glassford v. BrickKicker, 2011 VT 118, ¶ 12, 191 Vt. 1.

However, to withstand summary judgment there must be evidence presented "which creates an issue of material fact, no matter what view the court may take of the relative weight of that evidence." Booska v. Hubbard Ins. Agency, Inc., 160 Vt. 305, 309 (1993). Saying "they're lying" is not alone sufficient. "[T]he general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice." Wright, Miller, & Kane, 10A Federal Practice & Procedure: Civ. 3d § 2726.

The question is whether credibility is the issue here. The court does not find it significant that no one has an "eyewitness account" of the "aha" moment when the idea about using a particular ingredient came up. This is not the discovery of the Higgs boson we are talking about. It is the daily work of scientists in a laboratory and the multiple small steps along the path to a final product. Nor is it striking that employees cannot recall exactly which one of them suggested a particular idea. As for Mylan's claim that it is just too suspicious that Defendants chose to use both CSD and PVP (what Mylan describes as "the striking use by Defendants of the same two non-standard ingredients that Mylan selected for its Estradiol (one weekly) product," Ptfs.' Opp. at 52), the fact that Mylan's own 2004 patent application and its own package insert listed both neutralizes this argument regarding Trade Secret 3.

However, with regard to Trade Secret 4, Mylan does point to inconsistencies between interrogatory responses and witness testimony with regard to who knew what when. Moreover, the description of the alleged preexisting use of inline mesh is rather weak. The factual support

for this is limited to two things. The first is an excerpt from a manufacturing record saying "attach silicon tubing fitted with nylon cloth . . . to the out let [sic] of the manufacturing tank" and then "complete the filtration of bulk." Defs' SMF 151. The second is testimony that they had "an online filter" to "filter out the API particles." Id. ¶ 152. This is neither clear enough nor persuasive enough to establish that the filter idea was actually based upon past use of similar technology. The court cannot even tell whether it is the same sort of filter. Thus, the court denies summary judgment with respect to this alleged trade secret. "Given the . . . extremely factual nature of the inquiry, we cannot say that, as a matter of law, the [claimed trade secret] is not a trade secret." Dicks v. Jensen, 172 Vt. 43, 49 (2001).

## Damages

Finally, Defendants argue that the trade secrets claim cannot succeed because no damages can be proved. The court, as above, finds that the issue of which Mylan entity has a claim is an issue for trial. With regard to the issue of whether any damages can be proved in the absence of any sales yet by either Plaintiffs or Defendants, this is a red herring because Plaintiffs can obtain injunctive relief even if they cannot prove damages. 9 V.S.A. § 4602. Thus, this is not a basis for summary judgment.

## Unfair Competition

Govil and Noveltech ask for summary judgment on Mylan's claim for unfair competition on the ground that it is duplicative of other claims. Parties are allowed to assert alternative theories. This is not a basis for summary judgment.

**Indian Defendants' Motion**

Defendants Cadila, Zydus Technologies, Panjak Patel and Sunil Roy, who refer to themselves collectively as the "Indian Defendants," file a joint motion for summary judgment.

Trade Secrets

The Indian Defendants argue that there is no proof that they knew or had reason to know of any improperly obtained trade secrets. The court has already narrowed this issue to Trade Secret 4. The court is not persuaded that the record is clear enough to rule as a matter of law that the Indian Defendants should not have known of any use of Trade Secret 4 obtained through Govil.

Preemption of the Unfair Competition and Tortious Interference Claims

The motion points out that the Vermont Trade Secrets Act preempts all common law claims based upon alleged misappropriation. 9 V.S.A. § 4607. It then argues that the unfair competition and tortious interference claims are just that, because they are based upon the same facts, and must therefore fail.

Judge Crawford ruled on this same argument earlier in this case. *See* Decision on Motion for Judgment on the Pleadings (Aug. 9, 2012). He ruled that the other claims are distinct from the trade secret claim. Defendants offer nothing to suggest that the facts on which that ruling was based have changed. The court will not revisit the issue here.

Tortious Interference

The Indian Defendants also argue that the tortious interference claim fails because there is no proof that they intended Govil to breach his contract. For the same reasons that it ruled for Noveltech above, the court agrees. Given the poor drafting of the Agreement, Kwiatek's interpretation of the Agreement, and the Defendants' contractual agreement with Govil that he

would not violate any obligations to Mylan, the court cannot see how any jury could decide that these defendants knew it was substantially likely that Govil's employment with them would cause a breach of that agreement. The court will grant summary judgment for the Indian Defendants on this claim.

### Unfair Competition

The Indian Defendants argue that (1) the unfair competition claim is duplicative of the tortious interference claim, and (2) there was nothing unfair going on.

Mylan describes its unfair competition claim as being based upon Defendants' (1) concealing the creation of Noveltech to prevent Mylan from enforcing its rights against Govil, and (2) concealing their discussions with Govil "so they could benefit from the breach of Govil's fiduciary duties to" Mylan. Ptfs.' Opp'n at 20. This is not duplicative of the tortious interference claim.

The facts supporting this claim are slim, but there are two documents that can be read as suggesting an intent to hide the fact that Govil was working at Noveltech. If Mylan succeeds in proving its claim that trade secrets were being used by Noveltech, this evidence could support a claim that Defendants were intentionally hiding Govil's connection to the company to get a leg up on Mylan with its own data. This could potentially be found to be unfair competition. *See*, Maguire v. Gorruso, 174 Vt. 1, 7 (2002)("[C]ommon law unfair competition is a flexible and evolving concept, not confined to any particular form of unethical behavior.").

### Zydus Technologies

Zydus Technologies argues that it was not formed until 2009 and therefore cannot be liable for the tortious interference or unfair competition claims. As the court has already granted judgment on the tortious interference claim, that argument is moot. With regard to the unfair

36

competition claim, as noted above part of what Mylan points to is evidence that can be read as an attempt to keep Govil's connection with Noveltech secret. However, the emails it cites are from 2008, prior to the creation of Zydus Technologies. Although Mylan argues in its memorandum that Zydus Technologies was created for the purpose of making it harder for Mylan to prove its case, and that it is the alter ego of Govil and Cadila, those allegations appear nowhere in the unfair competition claim. *See* Second Amended Complaint, ¶ 90. Thus, the court agrees that Zydus Technologies is entitled to summary judgment on this claim.

<u>Patel and Roy</u>

Defendants Patel and Roy argue that there is no evidence that they played any role in any alleged wrongdoing. The claims in which they are named as defendants are those for tortious interference, misappropriation of trade secrets, and unfair competition. The court's ruling on the first is the same as for the other defendants, leaving the trade secret and unfair competition claims.

Patel and Roy are each the author of one of the documents arguably supporting the claim of unfair competition. Taking the facts in the light most favorable to Mylan, it is possible that a jury could find from this that they participated in corporate acts of unfair competition. <u>Prive v. Vt. Asbestos Grp.</u>, 2010 VT 2, ¶ 17, 187 Vt. 280. Thus, that claim remains for trial. However, the court finds no evidence that would support a claim personally against Patel or Roy for trade secret misappropriation. Mylan cites nothing but generalities about what they must have known, but these are far from sufficient to prove this claim against these individuals.

<u>Order</u>

**Plaintiffs' motion for summary judgment:** (1) the court agrees that Mylan has established that the Trade Secrets and Invention Agreement was assigned to Mylan, but the issue of whether it was breached by Govil is a question for the jury; (2) the court denies Mylan summary judgment on the breach of covenant claim; (3) the court denies Mylan summary judgment on the tortious interference claim; (4) the court denies Mylan summary judgment on the breach of fiduciary duty claim; (5) the court denies summary judgment on Mylan's claim of unfair competition; (6) the court grants Mylan summary judgment on Govil's counterclaim for breach of the stock option contract; (7) the court denies Mylan summary judgment on Noveltech's claim for unfair competition; (8) the court denies Mylan's claim for attorney's fees as premature.

**Govil and Noveltech's motion for summary judgment:** (1) the court grants summary judgment for Govil on the claim of breach of contract with regard to Estradiol (twice weekly) and Lidocaine on the ground that no damages can be proved, but denies it as to the other products at issue; however, the damages for this claim will be limited to nominal damages unless Noveltech receives FDA approvals prior to trial; (2) the court grants summary judgment for Govil on the claim that he breached his fiduciary duty by negotiating employment with Cadila prior to leaving Mylan, but denies it on the claims that he breached his fiduciary duty by diverting the Cadila opportunity from Mylan, and used confidential information or trade secrets in the negotiations; (3) the court grants summary judgment for Noveltech on the claim of tortious interference; (4) the court grants summary judgment for Govil and Noveltech on the claim of trade secret misappropriation with respect to alleged Trade Secrets 1, 2, 3, and 5; Trade Secret 4 remains for trial; (5) the court denies summary judgment on the unfair competition claim.

**The Indian Defendants' motion for summary judgment:** (1) the court grants summary judgment for the Indian Defendants with respect to alleged Trade Secrets 1, 2, 3, and 5, but denies it as to alleged Trade Secret 4; (2) the court grants summary judgment for the Indian Defendants on the claim of tortious interference; (3) the court grants summary judgment on the claim of unfair competition as to Defendant Zydus Technologies Ltd. but denies it as to the other defendants; (4) the court grants summary judgment for Panjak Patel and Sunil Roy on the claims of trade secret misappropriation but denies summary judgment on the claims of unfair competition.

Dated at Burlington this        day of April, 2015.

_____
Helen M. Toor
Superior Court Judge